The PEOPLE of the State of Colorado,
Plaintiff–Appellant,

v.

Johnny Maurice MELTON,
Defendant–Appellee.

No. 95SA358.

Supreme Court of Colorado,
En Banc.

Feb. 12, 1996.

John Suthers, District Attorney, Ann C. Joyce, Deputy District Attorney, Colorado Springs, for Plaintiff–Appellant.

Terry L. Perlet, Colorado Springs, for Defendant–Appellee.

Justice KOURLIS delivered the Opinion of the Court.

The prosecution brings this interlocutory appeal pursuant to section 16–12–102, 8A C.R.S. (1995 Supp.), and C.A.R. 4.1 challenging the trial court's order suppressing crystal methamphetamine obtained during a search of the defendant Johnny Maurice Melton. The trial court found that the police officers' initial contact with Melton constituted an investigatory stop that was not justified by reasonable suspicion of criminal activity. We hold that the initial encounter between the police and Melton was not an investigatory stop and that therefore the police did not need reasonable suspicion in order to approach and talk to Melton. Accordingly, we reverse the trial court's order of suppression and remand the case for further proceedings consistent with this opinion.

## I.

Johnny Maurice Melton was charged with possession of a schedule II controlled substance (crystal methamphetamine) with intent to distribute, pursuant to sections 18–18–405(2)(a)(I), 8B C.R.S. (1995 Supp.), and 18–18–204, 8B C.R.S. (1995 Supp.). Melton filed a motion to suppress all evidence and statements made by him. The trial court conducted a suppression hearing at which Officer Crestin Shields and Officer Wade Lerfald testified to the following facts.

On May 7, 1995, the Colorado Springs Police Department received a tip that drugs were being sold at a house on Dauntless Court. To investigate the tip, Officer Shields and his partner set up surveillance on the house. During surveillance, Officer Shields observed two people drive up to the residence and leave after a few minutes. Shields recognized the individuals from arrests on other drug charges in the past. Shields' partner stopped the two people a short time later but found no drugs.

The next day, after acquiring further information, Shields visited one of the two individuals he had seen at Dauntless Court the day before.[1] Shields obtained a search waiver from R.M. and searched his house. Shields found a pipe that tested positive for crystal methamphetamine. He then arrested R.M. for possession of a controlled substance.

After his arrest, R.M. told the police that he knew an individual named "J" or "Johnny" who had a large quantity of crystal methamphetamine. R.M. said he had been at Johnny's house approximately one week before the arrest and had seen assault type weapons and a golf ball size rock of crystal methamphetamine. R.M. further told police that Johnny lived at 98 Saddle Mountain Road in Rockrimmon.

Approximately ten minutes after hearing this information, Officer Shields, Officer Lerfald, and Officer Terry Mason went to 98 Saddle Mountain Road. All three officers were in uniform and travelled in separate police cruisers. When they arrived at the house, they saw a man, later identified as Melton, and two women standing in the front yard.

Officer Shields and the other officers approached Melton. Officer Shields asked Melton if he lived in the house. Melton said, "Yes." Shields then asked Melton if his name was "J" or "Johnny." Melton answered that his name was "Johnny."

After learning this information, Shields asked Melton to step to the curb by the police cruiser and then instructed Lerfald to do a pat down search of Melton. Officer Shields testified that he believed a pat down search was necessary because of the information that Melton owned assault weapons. As Officer Lerfald was performing the pat down search, he discovered a fanny pack and asked Melton to remove it. Lerfald testified that the fanny pack was very full and that he felt a hard round object inside it. Both Shields

---

1. The individual is a juvenile. In order to protect his identity, we will refer to him by his initials, R.M.

and Lerfald asked Melton what was inside the pack but Melton did not answer. Lerfald then opened the pack, looked inside, and found a hard round object that appeared to be a drug.[2] Shields then placed Melton under arrest.

After hearing this evidence, the trial court granted Melton's motion to suppress. The trial court analyzed the encounter between the police and Melton by separating it into two stages. First, the trial court considered whether Officer Lerfald's search of Melton and of the fanny pack was permissible. The trial court found that once the police officers knew Melton's identity, they had a reasonable and articulable suspicion that Melton might be armed and dangerous that justified the search of the fanny pack.

Second, the trial court analyzed the initial contact with Melton, when the officers approached him and asked his name and address. The court found that when they approached Melton, the police officers could not have had a reasonable suspicion that Melton had engaged in criminal activity. In particular, until the police officers asked Melton if his name was "J" or "Johnny," the police officers had no reason to believe that the individual they observed standing in the yard was involved in criminal activity. Because the trial court found that the police officers' initial contact with Melton was not justified by reasonable suspicion, it granted Melton's motion to suppress.

The prosecution requested that the trial court reconsider its ruling. It argued that the police officers' initial contact with Melton was a consensual encounter and that the Fourth Amendment to the United States Constitution was not implicated. The trial court agreed to reconsider its ruling and continued the proceedings.[3] The trial court determined that the encounter between Melton and the police was an investigatory stop, unsupported by reasonable suspicion, and not a consensual encounter. It therefore reaffirmed its suppression order.

The prosecution then filed the present interlocutory appeal.[4] We now hold that the police officers' initial contact with Melton was not a seizure or an investigatory stop under the Fourth Amendment to the United States Constitution and Article II, section 7 of the Colorado Constitution, but rather was a consensual interview.[5] As such, the police

2. The substance later field tested positive for amphetamines. The total weight was 128.2 grams, and the estimated value was $14,080.00.

3. The trial court specifically stated that its ruling would not become final for purposes of appeal until it ruled on the motion to reconsider.

4. Pursuant to C.A.R. 4.1, the prosecution must file an interlocutory appeal within ten days of the entry of the appealable order. A failure to file an interlocutory appeal within a timely manner would deprive this court of jurisdiction. *See People v. Donahue*, 750 P.2d 921, 922 (Colo. 1988). In this case, the prosecution filed its notice of appeal on October 30, 1995. This was within ten days of the trial court's ruling regarding the prosecution's motion to reconsider issued on October 23, 1995. The appeal, however, was not filed within ten days of the trial court's original ruling, issued on October 12, 1995, regarding Melton's suppression motion. The prosecution may not use a motion to reconsider purely as a device to extend the time in which to bring an interlocutory appeal or as a prosecutorial fiction in order to delay criminal proceedings. *See People in Interest of J.C.*, 844 P.2d 1185, 1187 (Colo.1993) (indicating that filing a motion to reconsider in order to circumvent the appeals process is impermissible); *Donahue*, 750 P.2d at 922–23 (disapproving of prosecution's tactic of

voluntarily dismissing charges and then appealing the court's suppression order in an effort to avoid untimely interlocutory appeal). However, if a judge reconsiders a ruling on a motion to suppress, the prosecution may appeal the modified ruling within the time limitations of C.A.R. 4.1. *People in Interest of J.C.*, 844 P.2d at 1188 (finding that since appeal was taken within ten days of modified ruling court had jurisdiction to hear case). In this case, there is no indication in the record that the prosecution's motion to reconsider was initiated as an attempt to circumvent the appeals process or unnecessarily delay the proceedings. Since the appeal was brought within ten days of the modified ruling, we have jurisdiction to hear the case.

5. The trial court's sole reason for granting Melton's suppression motion was its finding that the police officers' initial approach and questioning of Melton was not supported by reasonable suspicion of criminal activity. The court specifically ruled that the police had reasonable suspicion to search Melton and the fanny pack once they identified Melton as Johnny. Therefore, we limit our review of the trial court's rulings to whether the initial contact between the police and Melton was proper. We do not consider at this time whether there was sufficient reasonable suspicion to justify the search of Melton and the fanny pack.

did not need a reasonable suspicion of criminal activity in order to interview Melton. Therefore, we reverse the trial court's order of suppression and remand the case for further proceedings.

## II.

■ The Fourth Amendment to the United States Constitution and Article II, section 7 of the Colorado Constitution provide that the people shall be secure in their persons from unreasonable searches and seizures. "The Fourth Amendment does not proscribe all contact between police and citizens, but is designed 'to prevent arbitrary and oppressive interference with the privacy and personal security of individuals.'" *INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984) (quoting *United States v. Martinez–Fuerte,* 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976)). Thus, only when police-citizen contact impermissibly intrudes upon an individual's personal security or privacy are the United States or the Colorado Constitutions implicated. In *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968), the Supreme Court explained the difference between a seizure and other police-citizen encounters when it stated: "Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred." *See also United States v. Mendenhall,* 446 U.S. 544, 552, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.) (explaining that only when an individual is seized is there any foundation for invoking constitutional safeguards).

■ Case law has identified three types of police-citizen encounters: 1) arrest, 2) investigatory stop, and 3) consensual interview. *People v. T.H.,* 892 P.2d 301, 303 n. 3 (Colo. 1995); *People v. Trujillo,* 773 P.2d 1086, 1089 (Colo.1989). The first two, an arrest and an investigatory stop, are seizures and implicate constitutional protections. Therefore, they must be justified by probable cause and reasonable suspicion of criminal activity, respec-

tively. *People v. Johnson,* 865 P.2d 836, 842 (Colo.1994). The third, a consensual interview, is not a seizure and thus does not implicate the protections of the Fourth Amendment and Article II, section 7. *Id.*; *see generally* 4 Wayne R. LaFave, *Search & Seizure* § 9.3 (3d ed. 1996) (discussing police-citizen encounters that do not rise to the level of an investigatory stop).

■ During a consensual encounter, a police officer seeks the voluntary cooperation of an individual by asking non-coercive questions. *People v. Thomas,* 839 P.2d 1174, 1177 (Colo.1992). The individual is free to leave at any time during such an encounter or to ignore the police officer's questions. *Id.* Hence, the defendant is not seized within the meaning of the Fourth Amendment. *Id.*; *see also Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983) (opinion of White, J.) (stating that law enforcement officers do not violate the Fourth Amendment by approaching an individual and asking him if he is willing to answer some questions).

■ The test for determining if an encounter between a police officer and an individual is consensual is "whether a reasonable person under the circumstances would believe he or she was free to leave and/or to disregard the official's request for information." *Thomas,* 839 P.2d at 1177–78; *see also Florida v. Bostick,* 501 U.S. 429, 439, 111 S.Ct. 2382, 2388–89, 115 L.Ed.2d 389 (1991); *Delgado,* 466 U.S. at 215, 104 S.Ct. at 1762. This is an objective determination and it must be made based on the totality of the circumstances surrounding the encounter. *Johnson,* 865 P.2d at 842–43. In addition, the reasonable person test presupposes an innocent individual. *Id.*

■ When evaluating the totality of the circumstances, we have noted that a police-citizen encounter does not become a seizure simply because citizens may feel an inherent social pressure to cooperate with the police. *Id.* at 842. Similarly, a consensual encounter does not become an investigatory stop because the police do not inform the individual that he or she is free to leave. *Delgado,* 466 U.S. at 216, 104 S.Ct. at 1762–

63. "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *Id.* Rather, a court must consider the totality of the circumstances to determine whether the police exercised force or authority, or whether the police merely approached to conduct a consensual interview.

 After a review of the totality of the circumstances surrounding the police officers' initial contact with Melton, we conclude that Melton was not subjected to a Fourth Amendment seizure when the police officers approached him and asked him his name and address.[6] The officers approached in a non-threatening manner without their guns drawn. They did not attempt to detain Melton. They asked rather than demanded his name and address. In addition, the initial encounter lasted only seconds. Aside from the inherent pressure felt by any citizen to cooperate with law enforcement officers, the circumstances of this encounter were not so intimidating as to communicate to Melton that he was not free to leave or to decline to respond.

 The fact that the police officers went to Melton's house intending to question him and obtain a search waiver does not affect our analysis. The subjective suspicions of the police do not distinguish a consensual encounter from an investigatory stop. In fact, in most cases regarding consensual encounters the police approach individuals because they have suspicions about them. *See, e.g., Mendenhall,* 446 U.S. at 547, 100 S.Ct. at 1873 (indicating that police approached defendant because the defendant fit drug courier profile); *Royer,* 460 U.S. at 493, 103 S.Ct. at 1321–22 (opinion of White, J.) (same); *Johnson,* 865 P.2d at 837 (indicating that police approached defendant after watching him sprint through airport with a pillow case stuffed with clothes and a brown tweed bag). Allowing police to approach innocent citizens and ask them questions but not approach those suspected of crime seems to provide greater protection to criminals than others. The Fourth Amendment, however, protects all citizens equally.

 Further, unless the police officer's subjective intent in approaching the individual is communicated to that individual, it is not relevant to the determination of whether the encounter is a stop or a consensual encounter. *See Mendenhall,* 446 U.S. at 554 n. 6, 100 S.Ct. at 1877 n. 6 (opinion of Stewart, J.) (stating "that the subjective intention of the DEA agent in this case to detain the respondent, had she attempted to leave, is irrelevant except insofar as that may have been conveyed to the respondent"). The police are free to seek the help of any citizen by asking questions as are citizens equally free to decline to respond or walk away.

6. Although the issue was only peripherally raised by the parties below, was not ruled on by the trial court, and was not argued in the briefs here, we do note that the encounter between Melton and the police may have occurred on private property. Most police-citizen encounters that courts have characterized as consensual in nature have occurred on public property. *See, e.g., Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (indicating that encounter took place on public bus); *Johnson,* 865 P.2d 836 (indicating encounter took place in airport). We do not view the location of the police-citizen encounter as dispositive of whether the encounter is consensual or not. Rather, the location of the encounter is one factor to consider when determining whether a reasonable person would believe he or she is free to leave or disregard the official's request for information. An uninvited or unwelcomed intrusion by the police on private property may seem more coercive to a reasonable individual than a casual approach by the police in a public place. *See United States v. Bloom,* 975 F.2d 1447, 1453–54 (10th Cir.1992) (holding that a police-citizen encounter that took place in private train roomette outside of public view was one factor to consider when determining if police-citizen encounter constituted an investigatory stop); *United States v. Ward,* 961 F.2d 1526, 1531 (10th Cir.1992) (holding that while the non-public setting of the police-citizen encounter in a small private roomette on a train was not dispositive it supported the finding that a reasonable person would not have felt free to decline the police officer's request for information). In this case, however, we have concluded that Officer Shields' approach and questioning of Melton was non-coercive and non-threatening and therefore, consensual in nature. The trial court made no findings to indicate that this encounter was rendered more coercive by virtue of the fact that the police approached Melton while he was standing on the front lawn of a private residence.

In determining whether a police-citizen encounter is consensual, the relevant inquiry is whether a reasonable individual would believe he or she was free to leave or to disregard the official's request. As long as the police officers do not communicate their motives in making contact with the individual, these motives will not affect a reasonable individual's perception of the situation. Therefore, they do not affect the determination of whether the encounter constitutes a seizure.

In this case, there is no indication that the police made any statement to Melton or otherwise communicated their reason for approaching him prior to the pat down search. As such, the officers' hopes that they might obtain a search waiver from Melton do not affect our determination as to whether a reasonable person in Melton's position would have felt free to leave or disregard the officers' questions.

### III.

We conclude that under the circumstances of this case, the police officers' initial encounter with Melton was consensual in nature and was not an investigatory stop. Therefore, the police did not need reasonable suspicion to approach Melton and ask him where he lived and whether his name was "J" or "Johnny." We conclude that the trial court erred in holding that an unlawful seizure of Melton took place. Since a seizure did not occur until the police asked Melton to walk over to the police car for the pat-down search, the initial contact with Melton did not need to arise out of some reasonable suspicion that Melton had committed a crime. We reverse the trial court's suppression order and remand the case for further proceedings consistent with this opinion.

MULLARKEY, J., specially concurs, and KIRSHBAUM and SCOTT, JJ., join in the special concurrence.

SCOTT, J., specially concurs.

Justice MULLARKEY, specially concurring:

The majority holds that the police officers' initial encounter with Johnny Maurice Melton (Melton) was consensual and was not an investigatory stop requiring reasonable suspicion. Maj. op. at 678. Accordingly, the majority reverses the trial court's suppression order. Although I would reverse the suppression order and remand for further proceedings, my analysis differs from that of the majority. Accordingly, I specially concur.

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures." For constitutional purposes, " 'a 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed.' " *People v. Shorty,* 731 P.2d 679, 684 (Colo. 1987) (quoting *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984)). The "legitimacy of the defendant's expectation of privacy" depends on whether he or she manifested a subjective expectation of privacy in the area involved in the search, and whether society is willing to recognize that expectation as a reasonable one. *People v. Unruh,* 713 P.2d 370, 377 (Colo.), *cert. denied,* 476 U.S. 1171, 106 S.Ct. 2894, 90 L.Ed.2d 981 (1986).

Fourth Amendment protections are at their highest in the home including its curtilage. "At common law, the curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.' " *Oliver v. United States,* 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984) (quoting *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886)). Courts have held that the curtilage is an area where individuals have reasonable expectations of privacy. *Id.* at 170, 104 S.Ct. at 1737. In contrast, public areas such as sidewalks, shopping malls, and bus terminals are afforded less protection because of the individual's lack of a reasonable expectation of privacy. *See* 4 Wayne R. LaFave Search and Seizure § 9.3(a) (3d ed. 1996).

Here, the police officers' initial encounter with Melton occurred on the front lawn of Melton's home. The trial court made no

mention of the distinctions between public and private property in its oral ruling granting the motion to suppress. Melton raised the distinction between public and private property at the hearing for reconsideration of the suppression motion. Melton's attorney stated:

> The only language [in the case law] that perhaps the People are trying to rely on involves a police officer approaching someone on a public street or public place, which is clearly not the fact here at all. We were on private property, so I don't think anything in this case would be applicable.

The People argued in response that:

> It's the People's position that it doesn't matter specifically whether it's a public place or private place, but that by asking if he is willing to answer questions, or by putting questions to him, that that is a voluntary consensual stop by a police officer.

Although the trial court addressed the distinctions between public and private property at the reconsideration hearing, the court failed to make any findings as to Melton's reasonable expectations of privacy on the front lawn of his residence prior to the search of his fanny pack.

Hence, I would soundly reject the People's assertion that the public or private nature of the place of encounter is irrelevant. In my view, a consensual encounter cannot be initiated by a police officer who is in a place where he or she has no right to be. I would remand this case to the trial court for a factual determination of Melton's reasonable expectations of privacy while on the front lawn of his residence. Such a determination entails consideration of three factors: First, the general nature of the area subjected to the governmental intrusion. *See California v. Ciraolo*, 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986). Second, the use to which the defendant put the area in question. *See Oliver*, 466 U.S. at 170, 104 S.Ct. at 1737.

Finally, the police conduct that led to the search and seizure. *See People v. Gomez*, 632 P.2d 586 (Colo.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982). It may very well be that this police-citizen encounter did not occur within the curtilage of the defendant's home, and that the police were in a place where they were entitled to be when they initiated the contact with Melton. However, the facts in the record are not now sufficiently developed for that conclusion to be reached.

For these reasons, I specially concur in the majority opinion.

KIRSHBAUM and SCOTT, JJ., join in this special concurrence.

Justice SCOTT, specially concurring:

I join Justice Mullarkey's special concurrence. I write separately, nonetheless, to address the jurisdictional issue raised in footnote five of the majority opinion, maj. op. at 675 n. 5, and to make clear my concern that, if the majority opinion is read too broadly, (1) untimely filings made in reliance upon motions to reconsider may result in dismissal for want of jurisdiction, and (2) motions to reconsider will burden resolution of interlocutory matters with unnecessary review and delay.[1]

I

We cannot ignore jurisdiction's role as a predicate for our review. Our power to accept interlocutory appeals is governed in significant party by C.A.R. 4.1, which provides:

> (a) Grounds. The state may file an interlocutory appeal in the supreme court from a ruling of a district court granting a motion under Crim.P. 41(e) and (g) and Crim.P. 41.1(i) made in advance of trial by the defendant ... to suppress evidence....

> (b) Limitation on Time of Issuance. No interlocutory appeal shall be filed after ten days from the entry of the *order com-*

---

1. When permitted to toll the ten-day filing period under C.A.R. 4.1, 7B C.R.S. (1984), motions to reconsider present the potential for delay and implicate a defendant's constitutional right to a speedy trial guaranteed by art. II, § 16 of the Colorado Constitution and the Sixth and Fourteenth Amendments to the United States Constitution. *Martin v. People*, 738 P.2d 789, 791 (Colo.1987).

*plained of.* It shall not be a condition for the filing of such interlocutory appeal that a motion for a new trial or rehearing shall have been filed and denied in the trial court.

C.A.R. 4.1, 7B C.R.S. (1984) (emphasis added). Thus, in order for this court to have jurisdiction, the prosecution must "file an interlocutory appeal within a timely manner," maj. op. at 675 n. 5, or within ten days of the "order complained of." The failure to do so "would deprive this court of jurisdiction" to review the ruling of the trial court. *Id.* "[T]he judgments of a court acting outside of the limits of the constitutional and statutory provisions defining its subject matter jurisdiction are void." *Paine, Webber, Jackson & Curtis v. Adams,* 718 P.2d 508, 513 (Colo. 1986).

Given the clear requirements of C.A.R. 4.1, it is important to note the circumstances contributing to the timeliness of the interlocutory appeal presented here. On October 12, 1995, the trial court granted the motion to suppress, but agreed to "continue the matter to next week." On October 19, 1995, the People orally entered a motion to reconsider. At the end of that hearing, the district attorney asked, "[m]y concern is the 10–day rule on interlocutory appeals. Is the Court holding that it may consider a ruling reversible so that my 10–day period did not start until Thursday, or do I need to file something?" The court replied to this question stating, "[i]t won't start until I make a final ruling on Monday." On October 23, 1995, the court denied the motion to reconsider. The motion to suppress, therefore became "final" on October 23, 1995. The People filed a notice of interlocutory appeal on October 30, 1995.

After examining the facts of the instant case, I find that the motion to reconsider was not a prosecutorial fiction. Three factors are critical in this determination. First, assuming the trial court granted the defendant's motion to suppress on October 12, 1995, the motion to reconsider was filed, heard, and determined by the trial court on Monday, October 23, 1995, within the ten-day period for filing appeals with this court. Second, on October 19, 1995, at the hearing on its motion to reconsider, the prosecution, critically

aware of the ten-day rule, voiced its concern that its motion not interfere with the timeliness of its interlocutory appeal and, apparently because it did not consider its earlier ruling final, the trial court indicated the ten-day period had not begun to run. Finally, and perhaps most importantly, in my reading of the record and the transcript of the various hearings of October 12, 19, and 23, the trial court effectively reopened its October 12 order suppressing evidence by informing both the prosecution and the defendant that its order would not be "final" until its decision October 23, 1995. Given these facts it does not appear that the prosecution's motivation was to cause delay, nor were the defendant's rights to a speedy trial implicated.

In this case, the "order complained of" was "final" on October 23, 1995. Within ten days of the trial court's final order and ruling, the prosecution filed its petition with this court seeking review. In any event, I view the majority opinion as not positing an exception to the jurisdictional ten-day period by which a petition for review must be filed in this court.

## II

If a judge reconsiders an earlier ruling, it is only logical and reasonable that his or her *modified* ruling may be appealed. And, when appealed, review necessarily includes *both* the original ruling as well as the modified ruling. However, in light of the ten-day requirement set forth in C.A.R. 4.1, temporal limitations consistent with jurisdictional requirements must be considered. Elaboration is unnecessary under the facts present here because the prosecution and the trial court acted timely and reasonably so as not to raise those concerns. However, for example, questions regarding the tolling and the tacking of days between the original ruling, the motion to reconsider, the modified ruling, and the petition filed in this court could arise under different facts. Moreover, even though a timely filing by the prosecution within the ten-day period would otherwise meet the requirements of C.A.R. 4.1, it would not obviate speedy trial considerations in instances where the prosecution failed to file

the motion to reconsider contemporaneously with the suppression order or where, inadvertently or otherwise, the trial court failed to rule on the motion within a reasonable period of time.

### III

Accordingly, although I agree with the majority that the suppression order should be reversed, I would remand to the trial court for further proceedings. Today, however, I also make clear my concerns regarding the running of the ten-day period for jurisdiction in this court pursuant to Rule 4.1.