The PEOPLE of the State of Colorado,
Petitioner–Appellant,

v.

Filiberto Palma MORALES,
Respondent–Appellee.

No. 96SA413.

Supreme Court of Colorado,
En Banc.

March 3, 1997.

A. William Ritter, Jr., District Attorney, Second Judicial District, Nathan B. Coats, Chief Deputy District Attorney, Denver, for Petitioner–Appellant.

David F. Vela, State Public Defender, Lisabeth Perez Castle, Deputy State Public Defender, Denver, for Respondent–Appellee.

Justice KOURLIS delivered the Opinion of the Court.

The People bring this interlocutory appeal to challenge a suppression order entered by the District Court of the City and County of Denver. The order suppressed cocaine found taped to the body of defendant Filiberto Palma Morales as well as Morales's statements to law enforcement officers made during and after a pat-down search. The trial court held that the cocaine was discovered as the result of an illegal investigatory stop that was not based upon an articulable suspicion of criminal activity and that the statements were tainted by the circumstances of the stop. Because we conclude that the law enforcement officers did have a reasonable and articulable basis for suspecting criminal activity at the time they stopped Morales, we reverse the trial court's order and remand for further proceedings consistent with this opinion.

I.

On June 26, 1996, Morales arrived at Denver International Airport (DIA) on a flight from Los Angeles[1] via Phoenix. Officers Kenneth Gurule and Dennis Petersohn, Denver Police Department detectives assigned to the narcotics interdiction unit at DIA, were dressed in plain clothes and were monitoring the flight. Officer Gurule had been assigned to airport narcotics interdiction for approximately three years and had monitored several flights per day during that time. The officers observed Morales and his copassengers deplane. Morales initially began walking westbound on the concourse as if to leave the gate area and then made a U-turn and began walking eastbound toward a dead-end. Morales turned again, approached Officer Gurule and asked, "How do I get out of here?" Officer Gurule directed Morales toward the main terminal. Morales thanked Gurule and walked away. Morales began to walk in the direction indicated by the officer; however, he then attempted to leave the concourse by way of an employee exit marked "Restricted Access." Officer Gurule informed Morales that he could not exit through that door. At this time, the officers identified themselves as police officers and showed Morales their identification. Officer Gurule offered to help Morales return to the main terminal and Morales thanked him.

The officers and Morales began walking toward the train to the main terminal. As they walked, Officer Gurule asked if he could look at the airline ticket that Morales had in his hand. Morales handed Officer Gurule the ticket. Officer Gurule noticed that the ticket bore the name of Filiberto Morales but the baggage claim ticket stapled to the inside of the airline ticket jacket was in the name of Tige Yeargin. He also noticed that the ticket had been purchased with cash. Officer Gurule asked Morales for identification. Morales provided the officers with a valid California identification card and a social security card marked "Valid For Work Only With INS Authorization," both in his name. He indicated that he did not have any addi-

---

tional immigration papers with him. Officer Gurule testified that he then suspected Morales might be in the country illegally. After Officer Petersohn wrote down Morales's name, date of birth, and social security number, he returned the cards to Morales.

Morales and the officers engaged in casual conversation as they rode the train to the main terminal and walked to the baggage carousel. In the course of that conversation, Morales informed the officers that he was from Mexico and that he was in Denver to visit his brother and possibly to look for work.

After they reached the carousel, Officer Gurule waited with Morales for his bag and Officer Petersohn went to an immigration office near the carousel to ascertain whether Morales was in the country legally. While they were awaiting the bag, Officer Gurule noticed that Morales was wearing baggy, oversized clothing and that he had a bulge in his clothing around the neck. He mentioned it to Morales. Morales straightened out the collar of a shirt that he was wearing underneath his exterior clothing to remove the bulge.

When Morales's bag did not arrive, Officer Gurule accompanied him to the baggage clerk for the purpose of filling out a claim report. Morales told the baggage clerk that he had checked the bag at the curb, whereas the clerk indicated that the claim check was generated at the counter inside the terminal. According to Officer Gurule, Morales was indifferent about the lost bag, indicating, "That's okay, I will get it later," although he had earlier indicated that his work clothes were in the bag. After Morales had spoken with the baggage clerk, Officer Gurule offered to allow Morales to use a phone to call his brother. Officer Gurule led Morales to the immigration office to use the phone, but, because the office was locked, the two returned to the pay phones located between the office and the carousel.

Morales and Officer Gurule both made phone calls using pay phones next to one another. Officer Petersohn returned and informed Officer Gurule that he was unable to contact any immigration officials. Morales told the officers that he had not reached his brother, thanked them, and said that he would find another way home from the airport.

At that point, Officer Gurule asked Morales if he had ever been arrested. Morales answered that he had been arrested for a drunk driving charge. Officer Gurule next asked Morales if he had ever been arrested for any drug-related offenses. Morales answered that he had not, but that he had smoked marihuana in the past. Officer Gurule then asked Morales if he was carrying any illegal drugs. Morales replied that he was not carrying any drugs. Officer Gurule testified that he did not believe Morales's answer to his question. The officer asked Morales if he would consent to a pat-down search. Morales consented to the search. At the time Morales gave his consent, the officers had been with him for approximately thirty-five to forty minutes.

During the course of the pat-down, the officers felt a package concealed under Morales's clothes. Officer Gurule asked Morales what the package was and Morales said, "You got me. It's my polvo." [2] Morales then said it was his coca. The officers arrested Morales, placed him in handcuffs, and took him to their office where they recovered the substance, which later tests showed to be cocaine, and read him his *Miranda* rights. Morales waived his *Miranda* rights and made incriminating statements to the officers.

Following the filing of charges,[3] Morales brought a motion to suppress the cocaine and his statements. The trial court held that when Morales thanked the officers after the phone call and informed them that he would find another way home from the airport, the

---

2. Polvo is Spanish for "powder."

3. Morales was charged with unlawful possession of a schedule II controlled substance and unlawful possession with intent to sell, pursuant to § 18–18–405(2)(a)(I), 8B C.R.S. (1996 Supp.); unlawful possession with intent to sell twenty-

eight grams or more of cocaine, pursuant to §§ 18–18–405(2)(a)(I), –405(3), 8B C.R.S. (1996 Supp.); and unlawful importation of a schedule II controlled substance, pursuant to § 18–18–407(1)(d), 8B C.R.S. (1996 Supp.).

officers' further contact with Morales changed from a consensual encounter to an investigatory stop. The trial court found that such investigatory stop occurred in the absence of an articulable suspicion of criminal activity and therefore violated the constitutional prohibition against unreasonable searches and seizures. Thus, the trial court granted the motion to suppress.

## II.

Our jurisprudence on searches and seizures is well developed. With respect to the issue before us, we view the United States and Colorado Constitutions as coextensive and therefore follow United States Supreme Court precedent in identifying three types of police-citizen encounters: (1) consensual interviews; (2) investigatory stops; and (3) arrests. *See People v. Cascio,* 932 P.2d 1381, 1384–85 (Colo.1997) (consensual encounter with occupants of parked vehicle); *People v. Johnson,* 865 P.2d 836, 842 (Colo.1994) (consensual encounter at airport); *People v. Thomas,* 839 P.2d 1174, 1177 (Colo. 1992) (investigatory stop of moving vehicle followed by consensual encounter). Investigatory stops and arrests are seizures and therefore implicate the guarantees contained in the Fourth Amendment to the United States Constitution and Article II, section 7 of the Colorado Constitution. *See People v. Melton,* 910 P.2d 672, 676 (Colo.1996). An investigatory stop must be supported by an articulable suspicion of criminal activity, and an arrest by probable cause to believe criminal activity has occurred or is occurring. *Id.* A consensual interview does not need to be justified by either probable cause or reasonable suspicion of criminal activity. *Id.*

In this case, the trial court found that the encounter between Morales and the officers was a consensual interview[4] up to the time when Morales completed his phone call and informed the officers that he was leaving. Although we agree that the character of the encounter changed, we disagree with the trial court's conclusion that the investigatory stop was impermissible.

The officers' actions prior to the time at which Morales completed his phone call were entirely within the scope of a consensual interview. They identified themselves and displayed their badges; they asked to examine Morales's identification and airline tickets; and they asked where he lived and why he was in Denver. *See Florida v. Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389 (1991) (stating that a seizure does not occur "when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage—so long as the officers do not convey a message that compliance with their requests is required"); *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983) (holding that law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions); *United States v. Evans,* 937 F.2d 1534, 1537 (10th Cir.1991) (holding that merely approaching an individual in a public place and asking questions of the individual, including asking to examine the person's identification or requesting the person's consent to search his or her luggage is not a seizure as long as the police have not, by means of physical force or show of authority, restrained the liberty of the individual). The officers did not display force or do anything to restrain Morales's liberty and thereby suggest that he was seized prior to the completion of his phone call. *See United States v. Mendenhall,* 446 U.S. 544, 554–55, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.) ("Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that com-

---

4. The test for determining whether an encounter is a consensual one is "whether a reasonable person under the circumstances would believe he or she was free to leave and/or to disregard the official's request for information." *Thomas,* 839 P.2d at 1177–78 (citations omitted).

pliance with the officer's request might be compelled."); *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968) ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."); *Melton,* 910 P.2d at 677 ("[A] court must determine whether the police exercised force or authority, or whether the police merely approached to conduct a consensual interview.").

Similarly, a consensual encounter does not mature into a stop merely as a result of passage of time. In *Johnson,* we noted that "prolonged questioning by the police after a citizen has provided proper identification and has answered questions in a manner giving rise to no additional suspicion militates in favor of a finding that the citizen was seized." *Johnson,* 865 P.2d at 844. Length of time is certainly one factor to be considered in determining whether a consensual interview evolves into an investigatory stop; however, it is not the only factor. Here, the officers were in Morales's presence for approximately forty minutes, travelling from the gate to the baggage claim area, waiting for the bag, and conversing with the baggage clerk. During this time, the officers were not manufacturing delays or detaining Morales; they were offering legitimate assistance to Morales.[5] Furthermore, the officers did not engage in prolonged questioning. During the time the officers and Morales were together, the officers asked about Morales's ticket and identification, his place of birth, the city in which his flight originated, and why he had a bulge around his neck. The trial court found that this conversation among the officers and Morales was consensual on the part of Morales, which finding is supported by the record.

However, the trial court did find that there was a change in the tone and content of the detective's questions once Morales indicated that he would find another way home and thanked them for their help, and the officers turned their inquiry to possible criminal conduct. Merely asking questions about criminal conduct does not transform a consensual interview into an investigatory stop. *See Johnson,* 865 P.2d at 843 (holding that encounter was consensual where officers approached the defendant and, after asking for his airline ticket and driver's license, asked him if he was carrying any narcotics or large sums of money); *Thomas,* 839 P.2d at 1178 (holding that encounter between officer and defendant was consensual even after the officer began to ask questions about criminal behavior). However, such questions coupled with a tone of voice indicating that compliance with the request for information might be compelled may indicate a seizure. *See Mendenhall,* 446 U.S. at 555, 100 S.Ct. at 1877–78 (opinion of Stewart, J.); *United States v. Berryman,* 717 F.2d 651, 654 (1st Cir.1983) (finding that officers' intent to restrain defendant was communicated in their tone of voice, manner, and physical positions). Such a finding regarding tone of voice grows out of the trial court's assessment of the testimony offered by Officer Gurule and is not to be overlooked lightly in appellate review.

From that finding as well as from the trial court's determination that Morales attempted to terminate the interview, we conclude that the consensual interview grew into a stop for investigation once Officer Gurule began questioning Morales about possible criminal conduct after Morales thanked the officers and turned to leave.

### III.

An investigatory stop is permissible if: (1) there is an articulable and specific basis in fact for suspecting that criminal activity has occurred, is taking place, or is about to take

---

5. Officer Gurule testified that the reason he wanted Morales to use the telephone in the immigration office rather than the pay telephone was to delay him until Officer Petersohn returned. There is no evidence that this intent was communicated to Morales and thus it is not relevant to a determination as to whether the encounter was consensual. *See Melton,* 910 P.2d at 677 ("[U]nless the police officer's subjective intent in approaching the individual is communicated to that individual, it is not relevant to the determination of whether the encounter is a stop or a consensual encounter.").

place; (2) the purpose of the intrusion is reasonable; and (3) the scope and character of the intrusion is reasonably related to its purpose. *See People v. Weston*, 869 P.2d 1293, 1296 (Colo.1994) (permitting search of passenger compartment of automobile in context of investigatory stop); *People v. Martinez*, 801 P.2d 542, 544 (Colo.1990) (disallowing search into closed pouch incident to investigatory stop "frisk"). In determining whether the facts support the officers' actions, the trial court must consider whether, under the totality of the circumstances, the "specific and articulable facts known to the officer [at the time of the encounter], [when] taken together with rational inferences from these facts, create[ ] a reasonable suspicion of criminal activity to justify the intrusion into the defendant's personal security." *People v. Sutherland*, 886 P.2d 681, 686 (Colo.1994) (quoting *People v. Thomas*, 660 P.2d 1272, 1274 (Colo.1983)).

▉▉▉ The facts known to the officers at the time they asked Morales about criminal activity and requested consent to undertake a pat-down search rise to the level of an articulable suspicion of criminal activity. Specifically, they knew he had arrived from Los Angeles, a drug-trafficking source city, with a ticket that was purchased in cash. They knew that he changed direction twice on the concourse and attempted to exit through a restricted access door, either indicating legitimate confusion or indicating Morales's effort to avoid being followed. They further knew that there was confusion about Morales's airline ticket and his baggage claim ticket: his name did not appear on the claim ticket and he stated he did not know the individual whose name did appear on the claim ticket. Morales said the bag had been checked at the curb, and the baggage clerk stated that it had been checked inside at the counter. Also, Morales expressed indifference about the loss of the bag, when he had earlier stated that his bag contained work clothes that he would need in order to look for work. Lastly, Morales was wearing loose-fitting clothes that could conceal containers of drugs.[6] Whereas any one of these factors standing alone would not raise legitimate suspicion, the combination of facts supported a reasonable suspicion that Morales was engaged in some criminal activity. The United States Supreme Court has recognized that there are "circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot." *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980).[7] We conclude that this case presents such circumstances.

The next inquiry is whether the purpose of the intrusion associated with the investigatory stop was reasonable. In this case the intrusion consisted of three questions related to criminal activity and drug use, and then a request for consent to engage in a pat-down search. The purpose of the intrusion was to question Morales with respect to his prior criminal history and the drug trafficking the officers were investigating at DIA. We conclude that this purpose was reasonable in light of the specific and articulable facts known to the officers taken together with rational inferences from those facts. *See Terry*, 392 U.S. at 21, 88 S.Ct. at 1879–80; *Thomas*, 660 P.2d at 1274. The scope and character of the intrusion were appropriate for this purpose because the officers asked Morales only a few specific questions directly

---

**6.** By referring to Morales's attire, we indicate that it was a factor to be considered in the determination of whether Morales might be carrying illegal drugs. We recognize that many people wear loose fitting clothing. We do not imply that those individuals are somehow suspicious merely because of how they dress. *See People v. Rahming*, 795 P.2d 1338, 1342 (Colo. 1990) (holding in case where individuals were dressed as gang members that facts in addition to appearance would be necessary to justify detention).

**7.** In analyzing the question of when a combination of otherwise innocent circumstances may

lead to a reasonable suspicion of criminal activity, the United States Supreme Court has found that a person looking backward over his shoulder, concealing the fact that he was traveling with someone, and carrying no luggage was *not* enough to raise legitimate suspicions. *See Reid*, 448 U.S. at 441, 100 S.Ct. at 2754. Conversely, in *Royer*, a plurality of the Court concluded that reasonable suspicion of drug trafficking arose out of the combination of the defendant's use of an assumed name, paying cash for a one-way ticket, checking bags with incomplete identification, and nervous conduct. *See Royer*, 460 U.S. at 502, 103 S.Ct. at 1326–27.

related to possible involvement with narcotics.

■ Having satisfied ourselves that the investigatory stop was validly initiated, we now address the search itself. The officers requested permission from Morales to conduct a pat-down search. He gave that consent and during the search made two incriminating statements. Within the context of an investigatory stop, officers may conduct a pat-down search to locate any possible weapons if there is a reasonable suspicion that the individual is armed and dangerous. *See Martinez*, 801 P.2d at 544. Such was not the circumstance here: Officer Gurule testified that he was not searching for weapons and was not concerned that Morales was dangerous.[8] Hence, the validity of the search turns on Morales's consent.

■ It is axiomatic that a search based upon voluntary consent may be undertaken by government actors without a warrant or probable cause, and any evidence discovered during the search may be seized and admitted at trial. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973). However, "[c]onsent is valid only where it is given freely and voluntarily." *People v. Milton*, 826 P.2d 1282, 1286 (Colo.1992). Here, the trial court made no findings regarding the voluntariness of consent. Further, the question of voluntariness was only briefly addressed in testimony at the suppression hearing, was not argued before the trial court, and has not been presented here.

Although the record would appear to support a conclusion that the consent was free and voluntary,[9] we decline to reach the issue. Rather, we remand to the trial court with directions to make additional findings as to whether Morales's consent was voluntarily given. *See People v. Sutherland*, 886 P.2d 681, 688 (Colo.1994).[10]

## IV.

We conclude that when the officers' encounter with Morales ripened from a consensual interview into an investigatory stop, the officers had a reasonable and articulable basis upon which to detain Morales. We reverse the trial court's suppression order and remand the case for further proceedings consistent with this opinion.

---

**8.** The standard for determining whether a protective search following a lawful investigatory stop is permissible is an objective one and it is not essential that the officer actually have been in fear. *See United States v. Baker*, 47 F.3d 691, 693 (5th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2632, 132 L.Ed.2d 872 (1995); 4 Wayne R. LaFave, *Search and Seizure* § 9.5(a), at 253. Here, the objective standard was not satisfied because the facts known to the officers at the time of the pat-down would not have led a reasonable officer to believe that Morales was armed and dangerous.

**9.** For instance, the fact that Morales admitted the existence of the cocaine once the officer felt the package may lead to the inference that he took an active role in the investigation, which would bolster the voluntariness of his earlier consent. *See United States v. Yeagin*, 927 F.2d 798, 800–01 (5th Cir.1991). In addition, the officers did not misrepresent their purpose or authority, did not threaten Morales, and did not make a show of force. Furthermore, the officers had spent some time with Morales and determined that he understood English and was competent. *See People v.*

*Licea*, 918 P.2d 1109, 1113 (Colo.1996) (holding that defendant's consent, given while defendant was in custody and before he was advised of constitutional rights was voluntary under totality of circumstances in absence of evidence that defendant did not understand the request put to him or that police coercion overbore his will); *Milton*, 826 P.2d at 1286 (holding that consent to search was voluntary where there was no evidence in the record establishing that police officers made threats, used force, or concealed real purpose for the encounter; also no evidence that defendant was uneducated, had an impaired state of mind, or was in an unduly oppressive environment).

**10.** The pat-down search was reasonable and minimally intrusive. The officers frisked Morales over the exterior of his clothing. When they discovered the hard cylinder at his waistband, they placed him under arrest, took him into a private office and completed the search. If the consent was voluntary, then both the package of cocaine and the statements Morales made during the search are admissible. *See Schneckloth*, 412 U.S. at 219, 93 S.Ct. at 2043–44.