Gwen E. HENDRICKS, Petitioner,

v.

The PEOPLE of the State of
Colorado, Respondent.

No. 98SC256.

Supreme Court of Colorado,
En Banc.

Sept. 11, 2000.

Jane Hazen, Denver, Colorado, Attorney for Petitioner.

Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Alan J. Gilbert, Solicitor General, Catherine P. Adkisson, Assistant Attorney General, Appellate Division Denver, Colorado, Attorneys for Respondent.

Chief Justice MULLARKEY delivered the Opinion of the Court.

We granted certiorari to review the opinion of the court of appeals in a first-degree murder case, *People v. Hendricks*, 972 P.2d 1041 (Colo.App.1998). Prior to trial, pursuant to sections 16–8–103(2), 6 C.R.S. (1999), and 16–8–103.5(2), 6 C.R.S. (1999), defense counsel moved the trial court to impose a plea of not guilty by reason of insanity and the affirmative defense of impaired mental condition (collectively, mental status defenses) over the objection of the defendant, petitioner Gwen E. Hendricks (Hendricks). The trial court refused to impose the mental status defenses, the defendant was convicted, and the court of appeals affirmed. Hendricks now argues that the trial court and court of appeals conducted an erroneous legal analysis to evaluate defense counsel's motion under sections 16–8–103(2) and 16–8–103.5(2). She further contends that the court of appeals erred in affirming the trial court's rejection of her Crim. P. 35(c) motion seeking post-conviction relief on the basis of ineffective assistance of counsel.

We hold that the court of appeals utilized an erroneous legal standard to evaluate the imposition of the mental status defenses pursuant to sections 16–8–103(2) and 16–8–103.5(2). The judgment of the court of appeals is reversed and the case is remanded for proceedings consistent with this opinion.

## I.

Hendricks's husband, Air Force Sergeant James Hendricks (Jim), was fatally shot during the weekend of August 17, 1991.[1] Over that weekend, Hendricks contacted law enforcement authorities several times regarding Jim's absence, in some instances strongly suggesting that the officers search the area where Jim's truck containing his body was ultimately found. The ensuing investigation led to substantial circumstantial evidence indicating that Hendricks had killed her husband, as well as statements by Hendricks that suggested her role in his death.

The investigation also revealed evidence casting serious doubt on Hendricks's sanity at the time of Jim's death. A journal kept by Hendricks before the crime occurred detailed what she called "premonitions" of her husband's death, described voices she heard, and stated the basis for her belief that God had directed her to kill Jim and use the proceeds from his life insurance to establish the "James Hendricks Foundation" to help child victims of mafia-produced pornography.[2]

On August 29, 1991, Douglas County Sheriff Department investigators transported Hendricks to a hospital for a mental health evaluation and subsequently arrested her on the following day.

---

1. This case has an extensive factual and procedural background. We state only those aspects of the case relevant to our disposition today.

2. The journal explains that Hendricks, when faced with a problem or concern regarding her premonitions, would randomly point to a Bible passage to receive direct guidance from God. For example, in one entry, Hendricks writes:

> I reread Psalm 90 quite a few times before a small voice said, "Keep reading, keep reading." After reading the first page of stanzas, I knew I would be protected from the car bombs, the knifings, the guns, the contracts and all the other evil I had seen connected with busting the pornographers and pimps. Those mafia guys play rough, but somehow they just won't be able to get me. Then I turned the page to continue reading. It felt like a giant fist had slammed into my heart. I literally could not breath [sic]. I burst into sobs and sunk to the floor. I cried for Jim because he really was going to die.

### A.

At the arraignment, pursuant to sections 16–8–103(2) and 16–8–103.5(2), and over the objection of the defendant, Hendricks's public defenders provided notice of their intent to enter a plea of not guilty by reason of insanity and to assert the defense of impaired mental condition. The trial court ordered the Colorado Mental Health Institute (CMHI) to prepare a psychiatric evaluation to aid in determining whether the court should enter the defenses over the objection of Hendricks. The court ordered that the CMHI evaluation address whether the defendant "suffers a mental disease or defect," and if so, whether such disease renders the defendant incompetent to proceed and whether a plea of not guilty by reason of insanity is necessary for a "just determination of the charge against the defendant understanding that defendant, herself, refuses to permit the entry of such plea."

Both the CMHI psychiatrist and a psychiatrist for the defense submitted psychiatric reports to the court. These reports, however, differed greatly in their scope of analysis. The CMHI report focused exclusively on Hendricks's competence to proceed at trial—an issue requiring an analysis of the defendant's mental condition at the time of trial. Based on Hendricks's current mental state, the CMHI psychiatrist concluded that Hendricks was competent to proceed at trial. However, he expressly refused to address Hendricks's potential insanity or impaired mental condition—issues requiring an analysis of her mental state at the time of the offense—stating that he was not provided access to the necessary data.[3]

The psychiatrist hired by the defense evaluated Hendricks's state of mind at the time of the offense, utilizing evidence not considered in the CMHI report. The defense psychiatrist concluded:

> For over the past year the defendant has demonstrated profound swings of mood from suicidal depression to religious ecstasy. There are accompanying powerful ideas of reference (being influenced by random external events) and frank delusional beliefs (as noted in her journal). She developed a very tight and pseudological paranoid belief symptom that God wished her husband to be killed (sacrificed) so that insurance proceeds could provide a treatment facility for victims of mafia-produced child pornography.... I conclude that at the time of the alleged offense the defendant was so diseased in mind as to be incapable of distinguishing right from wrong with respect to the alleged act. She was profoundly and delusionally convinced that it was God's will. I further conclude that the defendant suffered an impaired mental condition which prevented her from forming a culpable mental state to perform the alleged offense.

Specifically, the defense psychiatrist, using evidence of both past and present mental state, concluded that the defendant "suffers from an AXIS I diagnosis of bipolar disorder, mixed, with mood congruent psychotic features."

At the continued arraignment held in April 1992, the trial court considered these reports and also engaged Hendricks in a conversation to determine the propriety of the People's motion to determine Hendricks's competency to proceed and defense counsel's request that the court impose the mental status defenses over Hendricks's objections. As with the CMHI report discussed above, the colloquy focused exclusively on Hendricks's present state of mind.

Based on its review of Hendricks's competency at the time of the hearing, the trial court refused to impose the defenses. The court concluded that Hendricks "is fully competent at this point in time," and therefore, "she has the right to enter the plea she chooses to enter in this matter."

The trial was delayed for approximately one year because, pursuant to section 16–8–111, 6 C.R.S. (1999), a judge not assigned to the trial declared Hendricks incompetent to proceed in September 1992 and committed her to the state hospital in Pueblo. That judge later found Hendricks restored to com-

---

**3.** The record does not indicate why the CMHI psychiatrist was not provided access to the data necessary for the insanity and impaired mental condition analyses.

petency in a June 1993 hearing, and the proceedings resumed.

Hendricks's private attorney, who succeeded the public defenders,[4] followed the.wishes of the defendant and did not attempt to assert a mental status defense at trial. Instead, defense counsel challenged the adequacy of the police investigation, claiming that the body found in the truck was misidentified and was not Jim's body. This defense was contrary to the overwhelming weight of evidence, however, including matching fingerprints, witness identification, and the presence of Jim's articles of clothing and items of identification near the body at the murder scene. The jury ultimately convicted Hendricks of first degree murder, *see* § 18–3–102, 6 C.R.S. (1999), and the court sentenced Hendricks to life imprisonment without the possibility of parole.

On appeal, Hendricks challenged the trial court's refusal to impose the mental status defenses. In affirming the trial court's decision, the court of appeals employed an analytical framework utilized by common law jurisdictions addressing whether a court should *sua sponte* enter a plea of not guilty by reason of insanity. *See Hendricks*, 972 P.2d at 1043–45. Under the common law approach, a court may not enter a plea of not guilty by reason of insanity over the objection of the defendant if that defendant "voluntarily and intelligently" waives assertion of the defense. *See Frendak v. United States*, 408 A.2d 364, 378–79 (D.C.1979).

Relying on these common law cases from other jurisdictions, the court of appeals held that a defendant has the absolute right to waive assertion of the mental status defenses if that waiver is done voluntarily and intelligently. *See Hendricks*, 972 P.2d at 1044. Using this framework, the appellate court concluded that the trial court did not err in refusing to enter the not guilty by reason of insanity plea or to assert the impaired mental condition defense over the objections of the defendant. *See id.* at 1045.

We granted certiorari to consider whether the court of appeals appropriately interpreted sections 16–8–103(2) and 16–8–103.5(2) and whether the private attorney's representation of Hendricks constituted ineffective assistance of counsel.[5] We now hold that the trial court and court of appeals failed to apply the correct legal analysis to defense counsel's attempt to impose the mental status defenses pursuant to sections 16–8–103(2) and 16–8–103.5(2). Therefore, we remand the case with directions for further proceedings consistent with this opinion. Because the trial court, on remand, may order a new trial rendering any claim of ineffective assistance of counsel moot, we do not reach that issue at this time.

## II.

At issue in this case is the correctness of the interpretation of sections 16–8–103(2) and 16–8–103.5(2) by the trial court and court of appeals.[6] The interpretation of these statutes presents a question of law subject to de novo review. *See United Airlines, Inc. v. Industrial Claim Appeals Office*, 993 P.2d 1152, 1157 (Colo.2000).

---

4. The public defenders withdrew from representing Hendricks at Hendricks's return to competency hearing in June 1993. Lloyd Boyer, a private attorney and the subject of the ineffective assistance of counsel claim, entered his appearance for Hendricks at that hearing and represented Hendricks during the trial. The public defenders resumed their role as counsel for Hendricks during the sentencing. Private, conflict-free counsel subsequently was appointed for the appellate phases of this action.

5. We granted certiorari on the following two issues:
  (1) Whether the court of appeals erred in holding that petitioner, as a competent defendant, was entitled to reject mental status defenses (not guilty by reason of insanity and impaired mental condition) even when these defenses were requested by her defense counsel pursuant to Colorado statutes requiring the trial court to enter such defenses on behalf of the defendant, if it finds that such defenses are necessary for a just determination of the charge against the defendant.
  (2) Whether the petitioner was denied effective assistance of counsel.

6. Neither the parties nor the courts below distinguished the applicability of section 16–8–103(2) and section 16–8–103.5(2), and we decline to address the issue as well. Additionally, we will refer only to section 16–8–103(2) unless a distinction is appropriate.

The statutory provisions at issue in this case are unique to Colorado. *Cf.* 2 American Law Institute, *Model Penal Code and Commentaries* § 4.03, at 229 & n. 24 (1985). They allow defense counsel to raise the defense of insanity, *see* § 16–8–103(2), or impaired mental condition, *see* § 16–8–103.5(2), over the objection of the defendant. Section 16–8–103(2) states:

> If counsel for the defendant believes that a plea of not guilty by reason of insanity should be entered on behalf of the defendant but the defendant refuses to permit the entry of the plea, counsel may so inform the court. The court shall then conduct such investigation as it deems proper, which may include the appointment of psychiatrists or psychologists to assist a psychiatrist to examine the defendant and advise the court. After its investigation the court shall conduct a hearing to determine whether the plea should be entered. If the court finds that the entry of a plea of not guilty by reason of insanity is necessary for a just determination of the charge against the defendant, it shall enter the plea on behalf of the defendant, and the plea so entered shall have the same effect as though it had been voluntarily entered by the defendant himself.

§ 16–8–103(2); *see also* Crim. P. 11(e)(2) (mirroring section 16–8–103(2)). Section 16–8–103.5(2) tracks this language but applies to the affirmative defense of impaired mental condition.[7] Thus, under either provision, a court shall enter the mental status defense over the defendant's objections if the court determines, after conducting the procedural steps outlined in the statute, that the defense is "necessary for a just determination of the charge against the defendant." § 16–8–103(2).

To place this case in context, we briefly examine the related doctrine at common law that imposes a duty on a trial judge to inject, *sua sponte*, the insanity defense over the objection of the defendak in certain circumstances.

## A.

The common law approach begins for our purposes with a line of cases developing from *Whalem v. United States*, 346 F.2d 812 (D.C.Cir.1965), in which courts imposed a duty on the trial court to inject, *sua sponte*, the issue of a defendant's insanity when sufficient question is raised as to the defendant's mental state at the time of the commission of the offense. *See id.* at 818–19 ("[A defendant] may, if he wishes, refuse to raise the issue of insanity, but he may not, in a proper case, prevent the court from injecting it."). These cases premised the court's duty on the recognition that an individual who commits a criminal act, but who "does not know what he is doing or cannot control his conduct or his acts are the product of a mental disease or defect, ... is morally blameless and not criminally responsible." *Id.* at 818. Further recognizing a public interest in refusing to hold criminally liable those defendants lacking mental responsibility, these cases protected that interest by imposing on the court the duty to inject the insanity defense into proceedings evidencing sufficient cause. *Cf. id.* at 818–19.

A subsequent line of cases rejected, in part, the *Whalem* analysis. Beginning with *Frendak v. United States*, many jurisdictions held that a defendant's right to voluntarily and intelligently waive imposition of the insanity plea must prevail over the broader public interests expressed in the *Whalem* line of cases. *See Frendak*, 408 A.2d at 378–

---

7. Section 16–8–103.5(2) states:

   If counsel for the defendant believes that an assertion of the affirmative defense of impaired mental condition should be entered on behalf of the defendant but the defendant refuses to permit counsel to offer such evidence, counsel may so inform the court. The court shall then conduct such investigation as it deems proper, which may include the appointment of psychiatrists or psychologists to assist a psychiatrist to examine the defendant and advise the court. After its investigation, the court shall conduct a hearing to determine whether evidence of impaired mental condition should be offered at trial. If the court finds that such a defense is necessary for a just determination of the charge against the defendant, it shall inform the prosecution that such defense shall be asserted at trial by the defendant and shall order the defendant's counsel to present evidence at trial on the defense of impaired mental condition.

   § 16–8–103.5(2).

79; *see also United States v. Marble*, 940 F.2d 1543 (D.C.Cir.1991) (overruling *Whalem*). *Frendak* and related cases relied on *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (holding that it is not unconstitutional for a court to accept a guilty plea from a defendant continuing to profess his innocence), and *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (holding that the Sixth Amendment grants to the defendant the right to proceed pro se). The *Frendak* approach reads these cases to pit the defendant's interest in autonomously conducting her own defense against the broader public interest in avoiding the imposition of criminal liability without mental responsibility. *See, e.g., Marble*, 940 F.2d at 1545–46; *Frendak*, 408 A.2d at 375–76. Under this analysis, a defendant's choice to forego an insanity defense must prevail if the choice is voluntary and intelligent. *See, e.g., Frendak*, 408 A.2d at 378.

It is important to recognize that those common law jurisdictions that have adopted the "voluntary and intelligent" waiver standard have done so not on constitutional grounds, but because statutory changes and case law development undercut the rationale that previously had supported the imposition of a mental status defense over the objection of a defendant. *See, e.g., Marble*, 940 F.2d at 1546 ("the *Whalem* line of cases has become a 'victim of the shifting sands' of statute and case law"); *Frendak*, 408 A.2d at 375–76 (quoting *Ralpho v. Bell*, 569 F.2d 607, 629 (D.C.Cir.1977)); *see also* 2 American Law Institute, supra, § 4.03., at 229 ("It is a genuine dilemma whether a defendant should have exclusive control over raising the [mental status] defense, or prosecutors and judges should be able to raise it in cases in which they think acquittal on that ground may be appropriate. The Supreme Court apparently considers it constitutional for a court to enter such pleas over defendant's objections."); *cf. People v. Anderson*, 266 Ill.App.3d 947, 204 Ill.Dec. 367, 641 N.E.2d 591, 598–601 (1994) (upholding defense counsel's decision to proceed with insanity defense over the objection of the defendant against claims of constitutional error). *But see Jacobs v. Commonwealth*, 870 S.W.2d 412, 418 (Ky.1994) (rejecting on constitutional grounds the imposition of a mental status defense over the objection of a defendant).

That the "voluntary and intelligent" waiver approach was a policy choice rather than a constitutional mandate was made clear in the leading case, *Frendak*:

Alford and *Faretta* both stress the importance of permitting a defendant to make decisions central to the defense a concern given little if any significance in *Whalem*. Neither case, however, renders the *Whalem* rule unconstitutional. In *Alford*, the Court expressly stated that a defendant does not have an absolute, constitutional right to have the trial court accept a guilty plea. It presumably follows, therefore, that although *Alford* supports reinterpreting *Whalem*, *Alford* does not imply a constitutional right to forego the insanity defense.

Similarly, the Court's decision in *Faretta*, a few years after *Alford*, did not make it unconstitutional for a trial court to interpose an insanity defense. Although the Court spoke in broad terms of a defendant's "constitutional right to conduct his own defense," the decision is limited to recognizing a Sixth Amendment right to appear pro se; it did not confer upon the accused a constitutional right to control all aspects of the defense.

*Frendak*, 408 A.2d at 375–76 (citations omitted); *see also id.* at 376 n. 19 (further noting that "[l]ower courts have been careful to construe *Faretta* to grant nothing more than a right to self-representation").

Thus, at common law, two different approaches have evolved. The Supreme Court has not spoken on the subject, and neither position can be considered constitutionally required. The majority position grants to the defendant an absolute right to waive imposition of a mental status defense provided that her waiver is "voluntary and intelligent." The minority position, on the other hand, allows a trial court to impose the defense over the wishes of the defendant when justice so demands. *Cf.* Christopher Slobogin & Amy Mashburn, *The Criminal Defense Lawyer's Fiduciary Duty to Clients with*

*Mental Disability*, 68 Fordham L.Rev. 1581, 1630 (2000) ("A majority of courts hold that the trial court may not impose an insanity defense over the defendant's objection, but a sizeable minority hold that this decision is within the trial judge's (and therefore the attorney's) discretion."); Robert D. Miller, et al., *Forcing the Insanity Defense on Unwilling Defendants: Best Interests and the Dignity of the Law*, 24 J. Psychiatry & Law 487, 500–01 (1996) (discussing a study that found that a minority of states permitted imposition of mental status defenses over a defendant's objections under various competency schemes). With this understanding of the treatment of the similar issue of court-initiated injection of a mental status defense in other jurisdictions, we now turn to the law in Colorado.

### B.

In Colorado, the relevant law as developed through case law and legislation shows that the interpretations of section 16–8–103(2) adopted by the trial court and court of appeals are too narrow because they fail to consider Hendricks's state of mind at the time of the offense. The following discussion of Colorado law illustrates the same tension between the individual and public interests exists here that has driven the resolution of this issue at common law. However, our law has reached a different result.

The statute itself compels a broader approach than that utilized by the lower courts. Section 16–8–103(2) was enacted in 1972 as part of the general revision of the criminal code. *See* ch. 44, sec. 1, § 39–8–103, 1972 Colo. Sess. Laws 190, 226. The plain language of the statute is expansive. The legislative direction to the judge is framed in the broadest of terms—the court must act to ensure the "just determination of the charge against the defendant." § 16–8–103(2). Indeed, similar statutory language describes the ultimate goal of the judiciary—reaching just determinations. *Cf.* § 16–1–103, 6 C.R.S. (1999) ("This [Code of Criminal Procedure] is intended to provide for the just determination of every criminal proceeding."); 1 American Bar Ass'n, *Standards for Criminal Justice*, std. 6–1.1, at 6–6 (2d ed.

Supp.1986). Further, the plain language of these subsections in no way intimates that "just determination" is limited by the "voluntary and intelligent" waiver principles adopted by the court of appeals. Had the General Assembly intended to turn the application of the statutory provision on the defendant's ability to waive the mental status defenses—the primary consideration in the court of appeals' approach—the legislature would have done so by including language that focused on the defendant's current state of mind as the dispositive issue. *Cf. City & County of Denver v. Gallegos*, 916 P.2d 509, 512 (Colo.1996) ("The legislative choice of language may be concluded to be a deliberate one calculated to obtain the result dictated by the plain meaning of the words."). But the legislature did not do so. Thus, the defendant's present ability to waive assertion of mental status defense is not meant to be the end of the inquiry.

Decisions of this court, while reflecting the tension between the two interests, also recognize a broader interpretation of the "just determination" inquiry than that accorded by the trial court and court of appeals. Prior to the statute's enactment, this court stated that "[u]nder no circumstances can the court, on its own motion, enter the plea of not guilty by reason of insanity." *See Boyd v. People*, 108 Colo. 289, 294, 116 P.2d 193, 195 (1941). That decision was premised on statutes then in force. *See id.* at 293–94, 116 P.2d at 194; *see also* ch. 48, § 483, 2 C.S.A. (1935) (requiring the entry of a plea of not guilty when a party refuses to plead at arraignment); ch. 48, § 507, 2 C.S.A. (1935) (requiring that the insanity defense be "pleaded orally, either by defendant or by counsel for defendant"). However, in dicta, this court also referenced a defendant's interest in autonomously choosing to forego imposition of a mental status defense, stating: "Defendant had an absolute right to be tried on the plea of not guilty . . ., and he did nothing to waive this right." *Boyd*, 108 Colo. at 294, 116 P.2d at 194.

Following the enactment of section 16–8–103(2), in *Les v. Meredith*, 193 Colo. 3, 561 P.2d 1256 (1977), this court upheld the statute's facial constitutionality against allega-

tions that the statute impermissibly interfered with a defendant's constitutional rights.[8] We premised this holding on the primacy, in certain instances, of the public interest in avoiding the imposition of criminal liability on those defendants who are not criminally responsible. The strength of this public interest prevailed over the individual's interest in his choice of defense. *See Les,* 193 Colo. at 6, 561 P.2d at 1259 ("We are firm in the belief that the administration of justice is improved if, upon having reason to do so and after holding a hearing, a trial judge can enter a plea of not guilty by reason of insanity on behalf of the defendant, irrespective of the defendant's wishes."). We expressly refused to follow that language in *Boyd* quoted above that potentially impugned the constitutionality of section 16–8–103(2) by recognizing an absolute right in the defendant to waive injection of an insanity defense. *See id.* Implicit in this rejection of *Boyd* as controlling the application of section 16–8–103(2) is the recognition that a "just determination" under the statute must include an analysis of the propriety of the mental status defense as established by an examination of the defendant's mental status at the time of the commission of the offense. *Cf. id.*

Within one year, we again considered these issues in *Labor v. Gibson,* 195 Colo. 416, 578 P.2d 1059 (1978). In *Labor,* we held that the trial court had no authority to enter an insanity plea on its own motion over the objection of both the defendant and his counsel. *See id.* at 418–19, 578 P.2d at 1060–61. However in dicta, as in *Boyd,* we again referenced a defendant's interest in choosing whether to assert a mental status defense. *See Labor,* 195 Colo. at 420, 578 P.2d at 1061 ("So long as the defendant is determined to

be presently mentally competent, it should be left up to the defendant and his counsel to make the tactical choice of whether to utilize this affirmative defense.").[9]

In the years following these decisions, the legislature has not changed section 16–8–103(2). Rather, it has extended the same procedures to allow the defense of impaired mental condition to be asserted by defense counsel over the defendant's objection. *See* ch. 188, sec. 1, § 16–8–103.5, 1983 Colo. Sess. Laws 672, 673; *see also People v. Swain,* 959 P.2d 426, 430–31 (Colo.1998) ("[T]he legislature is presumed, by virtue of its action in amending a previously construed statute without changing the portion that was construed, to have accepted and ratified the prior judicial construction."); *cf. Mason v. People,* 932 P.2d 1377, 1380 (Colo.1997) (legislative inaction in the face of a court's statutory construal indicates legislative agreement).

Having examined the scope of the statutes through Colorado statutory and case law, we now address the approaches utilized by the trial court and court of appeals. Finding those approaches inconsistent with Colorado law, we then set forth the appropriate analytical framework.

### III.

The legal standards applied by the trial court and court of appeals fail to give effect to the relevant interests embodied in section 16–8–103(2) and recognized by Colorado cases applying that statute. Both lower courts focused solely on the defendant's state of mind at the time of trial thereby addressing only the defendant's interest in autonomously choosing her defense. As our

---

8. The trial court ruled that application of the statute denied the defendant the right to confront the witnesses against him, the right to appear and defend against the charges made, the right to assert all available defenses, and the right to a public trial upon the merits of the charges in violation of the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution and article II, sections 16 and 25 of the Colorado Constitution. *See Les,* 193 Colo. at 5, 561 P.2d at 1258.

9. Read in the context of the opinion and the state of the law at the time, this statement merely supports the court's refusal to allow a court to

inject the insanity defense *sua sponte,* rather than creating an exception to sections 16–8–103(2) and 16–8–103.5(2). To the extent that this language or subsequent statements by Colorado courts relying on that language support a recognition of a defendant's absolute right to waive assertion of a mental status defense when such defense is sought by defense counsel pursuant to sections 16–8–103(2) or 16–8–103.5(2), we disapprove of that language. *Cf. People v. Lopez,* 640 P.2d 275, 277–78 (Colo.App.1982); *People v. Benns,* 641 P.2d 298, 299 (Colo.App.1981).

discussion above indicates, however, the issue before this court involves two important interests. One is that of the public, recognized in our statute, in ensuring that criminal liability is not imposed on someone lacking the mental capacity to commit the crime. The second is the defendant's interest in autonomously controlling her own defense. The first concern focuses on the defendant's state of mind when the crime was committed. The second looks to her ability at the time of trial to make the decision to forego the use of a mental status defense. It is the interplay between these two valid interests, as they are defined in Colorado with its statutory pronouncement, that a court must address when applying section 16–8–103(2).

### A.

The trial court's order appears to render section 16–8–103(2) wholly inapplicable by giving a presently competent defendant an absolute right to waive imposition of the insanity defense. In an extensive colloquy with the defendant, the court focused solely on the defendant's comprehension of the available pleas and the procedural implications of choosing each plea. The court concluded:

> The Court, however, finds in this case that Ms. Hendricks is fully competent at this point in time. She knows what she is about. She knows what she wants to do in this case, and her decisions as far as the plea she wants to enter is contrary to that of her attorneys. I believe she has the right to enter the plea she chooses to enter in this matter. She is the one who is charged with the offenses. She is one who must stand trial for those offenses in the event she enters a plea of not guilty.

█ Such an approach applies an incorrect legal standard. Section 16–8–103(2) applies only when the defendant objects to the imposition of the mental status defense. *See* § 16–8–103(2). However, only competent defendants can stand trial. *See Blehm v. People*, 817 P.2d 988, 993 (Colo.1991) ("[T]here is no question that putting a legally incompetent defendant on trial violates due process of law."); *see also* § 16–8–110(1)(a), 6 C.R.S. (1999). Thus, any defendant falling within

the potential purview of the statute under the trial court's interpretation—i.e., a defendant challenging her counsel's attempt to assert the mental status defenses—either would not be subject to trial because she is incompetent to proceed or, if competent, would have the absolute right to waive entry of the defenses. Under either scenario, section 16–8–103(2) would have no effect. Such a reading negates the very act of the General Assembly in adopting the statutes at issue and, therefore, is not a proper exercise of statutory interpretation. *Cf. Colorado Ground Water Comm'n v. Eagle Peak Farms, Ltd.,* 919 P.2d 212, 218 (Colo.1996) ("[A court] must give effect to every word of a statute, if possible. [Courts] are not to presume that the legislative body used the language idly and with no intent that meaning should be given to its language.") (internal quotation marks omitted).

The court of appeals, in affirming the trial court, adopted the common law approach that examines whether the defendant voluntarily and intelligently waived her right to assert the mental status defenses. *See Hendricks,* 972 P.2d at 1044. The court of appeals listed several factors to be considered in making its determination including the "primary factors" of the defendant's competency and desire not to enter a mental status defense, as well as other factors including the defendant's understanding of the consequences of her choice and whether the defendant has been "fully informed of the alternatives available and freely chooses to waive or assert the plea or defense." *Id.* As with the trial court, however, none of these factors considered by the court of appeals addresses the state of mind of the defendant at the time of the commission of the offense. Therefore, the approach adopted by the court of appeals does not consider the public interest in not convicting one who lacked the mental capacity to commit the crime.

The elements utilized by the trial court and approved by the court of appeals are not consistent with the analysis required under section 16–8–103(2). Consequently, both courts applied erroneous legal standards to make the findings required under that stat-

ute. We now set forth the appropriate analytical framework.

## B.

In conducting a "just determination" inquiry under sections 16–8–103(2) and 16–8–103.5(2), we now hold that a trial court must balance the two interests we have found to drive the legal issue before us—the public's interest in not holding criminally liable a defendant lacking criminal responsibility and the defendant's interest in autonomously controlling the nature of her defense. *Cf. Rodriguez v. District Court*, 719 P.2d 699, 706 (Colo.1986) (evaluating a defendant's waiver of his right to conflict-free representation by balancing "the defendant's preference for particular counsel ... and the public's interest in maintaining the integrity of the judicial process"). This balancing requires the court to consider not only the defendant's stated reasons for objecting to the mental status defenses at the time of arraignment—the side of the equation partially addressed by the lower courts—but also her mental capacity when the crime was committed. As discussed below, to balance these competing interests the trial court must consider the viability of a mental status defense by inquiring into the defendant's state of mind at the time of the commission of the offense. Against this, the court must consider the defendant's reasons for attempting to forego assertion of the mental status defense by examining whether those reasons satisfy a "basic rationality" inquiry.[10]

### 1.

To address the public interest embodied in the statute, the trial court first must consider the viability of the mental status defense that defense counsel asks the court to assert.[11] This inquiry necessarily entails an assessment of the mental state of the defendant at the time of the commission of the offense to determine whether there is substantial evidence that the defendant may be not guilty due to her mental status.[12] This court has recently explored the scope of the substantial evidence standard:

> Substantial evidence is more than a scintilla ... it must do more than create a suspicion of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion ... it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.

*City of Boulder v. Colorado Pub. Utils. Comm'n*, 996 P.2d 1270, 1278 (Colo.2000) (alterations in original) (quoting *CF & I Steel, L.P. v. Public Utils. Comm'n*, 949 P.2d 577, 585 (Colo.1997)).

In determining whether substantial evidence of a mental status defense exists, the trial court must be able to review a complete, neutral mental evaluation performed by a qualified expert who advises the court on the mental state of the defendant at the time of the commission of the offense. *See* § 16–8–103(2) (providing for "the appointment of psychiatrists ... to examine the defendant and advise the court"). However, obtaining such an evaluation raises at least two important concerns—the defendant's physician-patient privilege and her right

---

10. The evaluation of the presented evidence and the conclusions drawn therefrom necessarily include factual determinations. As such, appellate review of a trial court's decision to impose or not to impose a mental status defense over the objection of the defendant is subject to an abuse of discretion standard.

11. Jurisdictions utilizing the common law approach allow an inquiry akin to what we set forth here. In *Frendak*, for example, the court recognized that the trial court can refuse to impose the insanity defense on two grounds: (1) that the defendant voluntarily and intelligently waived the defenses, or (2) that insufficient evidence of insanity exists to warrant submitting the issue to the jury. *See Frendak*, 408 A.2d at 381 n. 31. Of course, the first ground is altered in Colorado by the statute we are construing. But the second ground involves an evaluation of the viability of a mental status defense, much as we set forth here.

12. Imposition of a mental status defense over the objection of a defendant should occur only in the most compelling cases. Therefore, if substantial evidence does not support a mental status defense, a court, without further inquiry, must refuse to impose the defense.

against self-incrimination.[13] The physician-patient privilege arises because the evaluating psychiatrist must review all necessary information needed to conduct the examination, which may include traditionally privileged information such as the defendant's records from prior hospitalizations and medical therapies. Given that the defendant opposes imposition of the mental status defenses, it may be necessary for the trial court to find that the defendant's physician-patient privilege is waived for the purposes of this evaluation only, *cf.* § 16–8–103.6(1)(a), 6 C.R.S. (1999) (requiring the waiver of the physician-patient privilege when a defendant places her mental condition at issue), and to order appropriate medical providers to supply records and to cooperate with the evaluating team.

Second, the defendant's privilege against self-incrimination may be implicated with respect to her statements as they are used by the examining psychiatrist. A court-ordered mental health evaluation raises special concerns when, as here, it is initiated to aid a court in determining whether to impose a mental status defense over the objection of the defendant. Therefore, we emphasize that the defendant does not waive her Fifth Amendment privilege against self-incrimination during the court-ordered evaluation. *Cf.* § 16–8–106(2)(a), 6 C.R.S. (1999) (providing that a "defendant shall have a privilege against self-incrimination during the course of a [mental health] examination"). A trial court must take appropriate precautions to ensure that statements by the defendant retain their privileged status. For example, in this case, the trial court correctly ordered an in-camera inspection of the state hospital's mental health evaluation to allow the court to determine whether distribution of the report to the prosecution was necessary and proper.

Thus, in ordering the mental health evaluation we discuss above in order to determine whether substantial evidence of a mental status defense exists, the trial court must treat the information contained in the mental health evaluation as privileged and confidential. The court cannot permit the prosecution access to the evaluation unless and until the court decides to permit the mental status defense to be entered.

### 2.

Against this public interest, the court must balance a defendant's interest in autonomous decision making with respect to her choice of defense. This necessarily entails an examination of the basis of that choice. *Cf., e.g., Faretta,* 422 U.S. at 819–20, 95 S.Ct. 2525 (discussing the right to self-representation, as implied from the Sixth Amendment, as a component of a more general "right to defend"); *Frendak,* 408 A.2d at 375–79. Courts have propounded several reasons why a defendant may choose to forego use of an otherwise viable mental status defense. *See, e.g., Labor,* 195 Colo. at 420, 578 P.2d at 1061 (avoidance of the possible greater length of "confinement" that may arise from commitment to a mental health facility); *id.* (avoidance of the social stigma attaching to an insanity or impaired mental condition determination); *see Frendak,* 408 A.2d at 376–77 (disparate quality of medical treatment); *id.* at 377 (collateral consequences of a mental status acquittal on things such as legal, voting, and driving rights, and subsequent civil commitment proceedings); *id.* (the denigration of a crime the defendant views as a religious or political protest); *id.* at 377–78 (avoidance of the perception that raising the defense is an admission of guilt). In appropriate circumstances, such concerns represent legitimate reasons to forego asserting the mental status defenses. Consequently, the defendant's choice should be accorded substantial weight in evaluating whether imposition of a mental status defense results in a "just determination of the charge against the defendant." § 16–8–103(2).

At the same time, it is not appropriate to give weight to a defendant's choice if that choice is founded in the defendant's delusions or is otherwise devoid of a rational basis. *See* Slobogin & Mashburn, *supra,* at 1592–94;

---

**13.** These very concerns were raised in this case. In a written motion and at the first arraignment hearing, defense counsel argued that the disclosure to the district attorney of information used by the psychiatrist to render an opinion as to Hendricks's mental state could impair Hendricks's right against self-incrimination and her physician-patient privilege.

*see also Frendak*, 408 A.2d at 378 ("[T]he trial court need only respect the defendant's choice when it determines that the defendant 'knows what he is doing and his choice is made with eyes open.'") (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942)). Thus, the role of the trial court with respect to this factor is to determine whether a defendant's reasons exceed a basic rationality threshold. Essential to satisfying this inquiry is an assessment by the trial court as to whether the defendant's reason for her decision has a "plausible grounding in reality." Slobogin & Mashburn, *supra*, at 1595. We emphasize that it is not appropriate for the trial court to substitute for those of the defendant, the court's own view of the wisdom of the defendant's choice provided the defendant's reasons for waiver satisfy the basic rationality test.

The common law jurisdictions conduct a similar assessment through the "intelligent and voluntary" inquiry. *See, e.g., Frendak*, 408 A.2d at 378. Like that inquiry, the basic rationality test we adopt here provides a court with the means to evaluate the propriety of assigning significance to a defendant's choice of defense. We adopt a standard distinct from the intelligent and voluntary test, however, to address the specific concerns implicated by the application of section 16–8–103(2).[14] A finding of competency to stand trial does not substitute for a finding of basic rationality.

■ With respect to the application of the factors we address above, we recognize that the public and individual interests generally will conflict when defense counsel invokes section 16–8–103(2) to raise a mental status defense over the client's objection. Therefore, we further hold that an individual's interest in autonomously controlling the nature of her defense, provided that interest is premised on a choice that satisfies the basic rationality test, will predominate over the broader interest of society unless pressing concerns mandate a contrary result. *Cf., e.g., Faretta*, 422 U.S. at 818–19, 95 S.Ct. 2525; *Alford*, 400 U.S. at 31–39, 91 S.Ct. 160; *Marble*, 940 F.2d at 1544–48; *Frendak*, 408 A.2d at 372–79.

■ In conclusion, a court seeking to make the "just determination" required under sections 16–8–103(2) and 16–8–103.5(2) must balance both the public interest and the individual interest implicated by the issue before us today. Given the strong nature of the individual interest at stake—autonomy in deciding an important aspect of her defense—application of the statute to impose a mental status defense necessarily will be limited. The case before us today, however, may fall within that limited application. Our review of the record raises significant questions as to the sanity of Hendricks at the time of Jim's murder. At the same time, the record indicates that Hendricks's sole reason for foregoing use of the mental status defenses—her protestations of innocence, often premised on her belief that Jim was not dead—is controverted by overwhelming evidence. This gives rise to the concern that her choice to forego use of a mental status

---

14. We have applied the "intelligent and voluntary" standard to a wide array of circumstances. *See, e.g., People v. Kyler*, 991 P.2d 810, 816–18 (Colo.1999) (entry of a guilty plea); *People v. Owens*, 969 P.2d 704, 706 (Colo.1999) (waiver of *Miranda* rights); *Tyson v. District Court*, 891 P.2d 984, 990–91 (Colo.1995) (waiver of the right to conflict-free representation); *People v. Curtis*, 681 P.2d 504, 512 (Colo.1984) (waiver of the right to testify). Numerous articulations of the analysis of this standard have emerged—some more useful to the issue before this court than others. *See, e.g., Kyler*, 991 P.2d at 816 (permitting a court to accept a guilty plea "only if [the defendant] completely understands the consequences of the plea and only if the guilty plea represents a free and rational choice"); *People v. Mejia–Mendoza*, 965 P.2d 777, 780 (Colo.1998) (voluntary and intelligent waiver of *Miranda* rights (1) must be free of coercion and (2) the defendant must be aware of the nature of the right and the consequences of the decision to waive it); *Curtis*, 681 P.2d at 514 (recognizing a voluntary and intelligent waiver when a defendant is cognizant of the right she holds and the consequences of waiving that right). Unlike these contexts, however, section 16–8–103(2) will arise only when concerns regarding a defendant's mental state exist. *Cf., e.g., Frendak*, 408 A.2d at 378 (recognizing the special concerns presented when a defendant's mental health is questioned). Of critical concern, therefore, is that the defendant's rationale is not impeded by a potentially decision-affecting mental condition. Consequently, we focus the analysis of the defendant's rationale to address this specific concern through the use of the basic rationality test.

defense is a manifestation of a mental illness and, therefore, does not have a plausible grounding in reality. On remand, should the trial court find that substantial evidence supports a mental status defense, and that Hendricks's reasons for objecting to the defenses do not satisfy the basic rationality test, the court should order a new trial an impose the mental status defenses pursuant to sections 16–8–103(2) and 16–8–103.5(2).

### IV.

The trial court and court of appeals erroneously applied sections 16–8–103(2) and 16–8–103.5(2) for the reasons stated above. We reverse the judgment of the court of appeals and remand this case with directions to return it to the trial court to conduct an inquiry consistent with this decision.

### V.

Because our resolution of the issue pertaining to sections 16–8–103(2) and 16–8–103.5(2) may require a new trial on remand, we decline to address whether Boyer's representation of Hendricks constituted ineffective assistance of counsel.