The PEOPLE of the State of Colorado,
Plaintiff–Appellee,

v.

Rasheed Jamal BRANDON,
Defendant–Appellant.

No. 03CA1176.

Colorado Court of Appeals,
Div. II.

July 14, 2005.

Rehearing Denied Dec. 15, 2005.

Certiorari Denied July 17, 2006.*

* Justice EID does not participate.

**16**

John W. Suthers, Attorney General, Elizabeth Rohrbough, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee.

David S. Kaplan, Colorado State Public Defender, Ned Jaeckle, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant.

ROTHENBERG, J.

Defendant, Rasheed Jamal Brandon, appeals the judgment entered upon a jury verdict finding him guilty of possession of a controlled substance (one thousand grams or more), tampering with evidence, and resisting arrest; and the sentence imposed following a bench trial finding him guilty of two habitual criminal counts. Because we conclude the trial court erred in denying defendant's motion to suppress evidence, we reverse and remand for a new trial.

### I.

At the hearing on defendant's motion to suppress, the People presented testimony which supported the following facts. A Utah state patrol officer pulled an automobile over and ticketed defendant, the driver, for speeding. Defendant is an African-American male, and his passengers, Jason Williams and Denisha Bush, are also African-Americans. Bush was a codefendant at trial.

During the stop, the Utah officer became suspicious about possible illegal drug activity and attempted to search the car by consent. However, the initial consent given by defendant was withdrawn, and no search was performed. The Utah officer then called the Colorado Highway Patrol and stated that he had just stopped a car with three persons in it who appeared nervous. The Utah officer described them by race and supplied a de-

scription of the car and its license plate number.

Later that same day, the car—which was then being driven by Bush—was pulled over by Colorado Highway Patrol Troopers Hunter and Tobias, accompanied by a drug sniffing canine, who had been waiting for the car after receiving the tip from the Utah Highway Patrol.

According to Trooper Hunter, the car was traveling sixty-five miles an hour in a sixty-mile-an-hour zone. Hunter asked Bush to step out of the car and stand behind it on the side of the road, but in front of the patrol car. He asked her where she was going, and she said she was heading to Denver or Glendale for a cousin's funeral. Hunter asked Bush for identification, and she provided an identification card. She said she had forgotten her driver's license, and so Hunter called dispatch to see whether she had a valid license.

Hunter testified that, because the license check initially revealed that Bush did not have a license, he went back to the car and asked defendant whether he had a license and could drive. While defendant handed over his license, Hunter asked Williams where he was going, and Williams said he was going "[t]o Denver to visit relatives." Hunter asked whether the trip was for anything else, expecting to hear about the funeral, and became suspicious when Williams did not mention it. Soon afterwards, Trooper Tobias received a call from dispatch confirming that Bush had a valid California driver's license.

After Hunter received that information from Tobias, he went to Bush, who was still outside the car, handed her paperwork back to her, and told her to "[p]lease slow down, get an insurance card, and have a safe trip." However, Hunter further testified that, "within a second or so," he told Bush he had concerns about her story, particularly because Williams did not know about the funeral. Hunter asked her how her cousin had died, and she began crying. He continued to question her, asking whether she had anything illegal in the car, including a list of specific drugs, weapons, or cash. She said she did not.

Hunter testified that he then asked Bush whether he could search her car for drugs. She asked, "Why?" and he said he just wanted "to look" and "it will take just a few minutes and you can be on your way." She responded that she wanted to go on to the funeral in Denver. Hunter said he understood, but again asked to search her car. According to Hunter's testimony, which the trial court found credible, after two requests, Bush replied, "Sure." Over defendant's vociferous objection, Hunter put the dog in the back seat of the car. The dog "alerted" to a bag there which was then searched. It contained a large amount of cocaine.

The patrol car was equipped with a video camera that was also capable of recording sound. However, much of the exchange between the passengers and the officers was not recorded or is unintelligible, and much of the conversation between Bush and Hunter is off camera. Hunter explained that he did not have the microphone that would have recorded the verbal exchanges.

The trial court credited the troopers' testimony over Bush's testimony and denied defendant's motion to suppress, finding that the state troopers' initial encounter with Bush—which lasted from the time the car was pulled over until Bush's paperwork was returned—was a valid investigatory stop resulting from an alleged traffic violation. The court also found that once Bush's paperwork was returned to her, there was no basis for the continued detention of the vehicle or its passengers because no reasonable suspicion existed, but that the search nevertheless was valid because Bush voluntarily consented to it and was the record owner of the car.

## II.

Defendant contends the trial court erred in denying his motion to suppress evidence. He maintains that the search of the vehicle was the product of an unlawful detention and that Bush's later consent to the search and the resulting discovery of the contraband was obtained through the exploitation of the unlawful detention. He also contends he and the other occupants of the vehicle were victims of racial prejudice. We agree the mo-

tion to suppress should have been granted and therefore need not address his contention that the vehicle was stopped partially or totally because of the race of the occupants.

### A.

Initially, we note that the trial court found that Bush was the title owner of the car, but that both she and defendant used it. Further, the court "assume[d], without deciding, that [defendant] had an interest in the vehicle adequate for him to be considered a person who could consent to the search." *See People v. Tufts,* 717 P.2d 485, 490 (Colo.1986)(concluding the evidence supported the inference that the defendant was allowed by the registered owner to use the car); *People v. Naranjo,* 686 P.2d 1343, 1346 (Colo.1984)(a passenger's status alone does not establish a legitimate expectation of privacy in an automobile's passenger compartment, but standing is conferred if the defendant-passenger asserts a possessory or proprietary interest in the car or the items seized, or if the owner gives the defendant permission to use the vehicle).

On appeal, the People have not disputed defendant's standing to challenge the constitutionality of the search, and we therefore need not address it.

### B.

When reviewing a trial court's suppression order, we defer to its findings of fact, but review its conclusions of law de novo. *People v. Haley,* 41 P.3d 666 (Colo. 2001). We must determine on appeal whether the trial court applied the correct legal standards to the facts of the case, and whether sufficient evidence in the record supports its legal conclusions. *People v. Rivas,* 13 P.3d 315, 320 (Colo.2000)("[T]he trial court's application of legal standards to those facts is treated as a question of law to be reviewed de novo.").

Hence, we review de novo the legality of the Colorado troopers' traffic stop of the vehicle and its three occupants, and the legality of the troopers' conduct following the initial encounter. *See People v. Haley, supra.*

Here, the trial court found, and the parties agree, as do we, that the initial encounter was a valid investigatory stop resulting from an alleged traffic violation. *See Whren v. United States,* 517 U.S. 806, 809–10, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996)("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]."); *Delaware v. Prouse,* 440 U.S. 648, 659, 99 S.Ct. 1391, 1399, 59 L.Ed.2d 660 (1979)(generally, the decision to stop an automobile is reasonable where the police have probable cause to believe a traffic violation has occurred).

The trial court further found that once Bush's paperwork was returned to her, there was no basis for the continued detention of the vehicle or its passengers because no reasonable suspicion existed. That finding is also not challenged.

At issue, therefore, is the legality of the troopers' conduct following the initial encounter.

### C.

The Colorado Supreme Court has stated that "[w]hen ... the purpose for which [an] investigatory stop was instituted has been accomplished and no other reasonable suspicion exists to support further investigation, there is no justification for continued detention and interrogation of citizens." *People v. Redinger,* 906 P.2d 81, 85–86 (Colo.1995).

Thus, once a driver produces a valid license and proof that he or she is entitled to operate the vehicle, the driver "must be allowed to proceed on his [or her] way, without being subject to further delay by police for additional questioning." *People v. Rodriguez,* 945 P.2d 1351, 1360 (Colo.1997)(quoting *United States v. Mendez,* 118 F.3d 1426, 1429 (10th Cir.1997)); *see People v. Cervantes-Arredondo,* 17 P.3d 141, 147 (Colo.2001)("The [traffic] stop usually must 'last no longer than is necessary to effectuate the purpose of the stop,' and the 'scope of the detention must be carefully tailored to its underlying

justification." ') (quoting *People v. Ingram*, 984 P.2d 597, 603–04 (Colo.1999)).

In *People v. Cervantes–Arredondo, supra*, the court recognized the danger "that citizens may be coerced into answering questions that they are not required to answer, or into allowing the search of a vehicle that they are not legally obligated to allow," and observed, "The transition between a detention and a consensual exchange can be seamless. Most citizens would not recognize the transition and would not feel free to terminate the encounter absent a clear endpoint to the investigative detention." *People v. Cervantes–Arredondo, supra*, 17 P.3d at 147 (citations omitted). The court added:

> [A] traffic stop followed by a request for consent to search is not made up of two separable contacts, but one interaction in distinct phases. They are part of the same continuous contact, which begins with a routine traffic stop. Accordingly, an extended contact must be reviewed by considering the facts and circumstances that gave rise to the initial stop plus any additional information learned by the officer before issuing a warning or citation. The duration and conditions of the contact must be viewed in the context of the entire stop.

*People v. Cervantes–Arredondo, supra*, 17 P.3d at 147–48 (citations omitted).

■ Normally, an officer must return a driver's documentation before a detention can end and a consensual encounter can begin. *United States v. Mendez, supra*, 118 F.3d at 1429; *see People v. Jackson*, 39 P.3d 1174 (Colo.2002). However, the return of the driver's documentation is not necessarily sufficient to demonstrate that an encounter has become consensual. *United States v. Elliott*, 107 F.3d 810, 814 (10th Cir.1997); *United States v. Werking*, 915 F.2d 1404, 1408 (10th Cir.1990)(the return of the driver's documents will not end a detention if the driver "has an objective reason to believe that he was not free to end his conversation with the law enforcement official and proceed on his way"); *United States v. McKneely*, 6 F.3d 1447, 1451 (10th Cir.1993)(" 'once the officer has returned the driver's license and registration in a routine traffic stop, questioning about drugs and weapons or a request for

voluntary consent to search may be "an ordinary consensual encounter between a private citizen and a law enforcement official" ' *so long as a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information* " (emphasis added; quoting *United States v. Werking, supra*, 915 F.2d at 1408, and *United States v. Turner*, 928 F.2d 956, 958 (10th Cir.1991))); *see Cervantes–Arredondo, supra*.

■ Applying those principles here, we conclude—as did the trial court—that once Bush's paperwork was returned to her, there was no basis for the continued detention of the vehicle or its passengers. She and her passengers should have been allowed to go on their way.

The recent United States Supreme Court decision in *Illinois v. Caballes*, 543 U.S. 405, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005), does not require a different result. In *Caballes*, the defendant's car was subjected to a dog sniff of the exterior during a lawful traffic stop. The court held that the use of a well-trained narcotics dog, where the use of the dog would not expose legal items to public view that would otherwise remain hidden, does not implicate legitimate privacy interests for Fourth Amendment purposes.

However, *Caballes* is distinguishable from the present. The Court there emphasized the fact that the police did not improperly extend the duration of the defendant's stop to conduct the dog sniff. The Court acknowledged that, had the dog sniff occurred while the defendant was being unlawfully detained, a different result would have been required under the Fourth Amendment. *Illinois v. Caballes, supra*.

### D.

The People urge us to uphold the trial court's ruling because the court found that Bush voluntarily consented to the search of the car. We are not persuaded.

■ Once the underlying basis for an initial traffic stop has concluded, it does not automatically follow that any further detention for questioning is unconstitutional.

Lengthening the detention for further questioning beyond that related to the initial stop is permissible if (1) the officer has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring; or (2) the initial detention has become a consensual encounter. *Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996).

■ Where, as here, law enforcement officers lack a reasonable suspicion of criminal activity to justify further detention beyond the scope of the initial traffic stop, the question becomes whether the traffic stop evolved into a consensual police-citizen encounter not implicating the Fourth Amendment. *See Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

■ In a consensual encounter, the individual voluntarily cooperates with the police and is free to leave at any time. *Outlaw v. People*, 17 P.3d 150 (Colo.2001); *Cervantes–Arredondo, supra*. The test is objective in nature, based on the factual circumstances surrounding the encounter. *See People v. Paynter*, 955 P.2d 68, 72 (Colo. 1998). It does not turn on the subjective intent of the police officer. *Ohio v. Robinette, supra; Whren v. United States, supra*.

Here, it is undisputed that "within a second or so" after telling Bush to have "a nice day," Trooper Hunter told her he had problems with her story and continued to question her about why her passenger Williams did not know about the funeral and how her cousin had died.

■ Even if we assume there was no impropriety up to that point, we conclude that what followed amounted to an illegal detention. Bush burst into tears, yet Hunter continued to ask a series of questions, none of which related to the speeding offense, and then asked for permission to search the car. Bush asked Hunter why he wanted to do so and indicated that she wanted to be on her way, but Hunter ignored her comments. Instead, he asked her whether there were any illegal drugs, weapons, or large amounts of cash in the car, and again asked to search the car. Only then did Bush accede to his request.

A videotape of the encounter was admitted, which further showed that the car was stopped in a canyon, not in a town or urban area; that Bush was outside the car and separated from her passengers; and that Hunter, who is much larger than Bush, was standing between her and the most direct path to the driver's side door of her car.

In her concurring opinion in *Robinette*, Justice Ginsburg joined the majority in rejecting Ohio's bright line rule requiring that motorists be told of their right to refuse to consent to a car search. But she discussed the rationale for formulating such a rule:

> Most people believe that they are validly in a police officer's custody as long as the officer continues to interrogate them. The police officer retains the upper hand and the accouterments of authority. That the officer lacks legal license to continue to detain them is unknown to most citizens, and a reasonable person would not feel free to walk away as the officer continues to address him.

*Ohio v. Robinette, supra*, 519 U.S. at 41, 117 S.Ct. at 422 (Ginsburg, J., concurring)(quoting *State v. Robinette*, 73 Ohio St.3d 650, 654–55, 653 N.E.2d 695, 698–99 (1995)).

Here, after applying an objective test based on the totality of the circumstances, we conclude that what may have begun as a consensual encounter between Trooper Hunter and Bush escalated into an unlawful detention or seizure as the result of Trooper Hunter's continued questioning of Bush. This is because, in our view, a reasonable person in Bush's position would not have believed she was free to leave or to ignore Trooper Hunter's repeated requests for information. *See People v. Melton*, 910 P.2d 672 (Colo. 1996). Contrary to the People's contention, no further show of force by the trooper was necessary. *See People v. Haley, supra*.

In their brief on appeal, the People made no attempt to distinguish *People v. Haley, supra*, the facts of which are strikingly similar to those before us and even occurred in the same county. *Haley* involved evidence obtained as a result of a dog sniff search of a car after the reason for the traffic stop had been completed. Rather, the People rely on

*People v. Melton, supra,* and *People v. Jackson, supra,* which we conclude are distinguishable.

In *Melton,* the officers approached the defendant in a nonthreatening manner in the front yard of his house and asked him for his name and address. The initial encounter lasted only seconds, and the court concluded the defendant was not subjected to a Fourth Amendment seizure.

In *Jackson,* the defendant was a passenger in a car that was lawfully stopped for a traffic violation. At issue was whether the officer's request for the defendant's identification without reasonable suspicion constituted a seizure in violation of the Fourth Amendment. The court concluded that it was not a seizure, but that the officer's request and the defendant's compliance therewith was a consensual encounter. *People v. Jackson, supra,* 39 P.3d at 1186–87. Therefore, neither *Melton* nor *Jackson* requires a different result.

### E.

■ We further conclude Bush's consent to the search, resulting in the contraband being found in the car, was obtained through the exploitation of the unlawful detention. *See People v. Haley, supra; People v. Rodriguez, supra; People v. Redinger, supra.*

In *Rodriguez,* the Colorado Supreme Court discussed the analysis to be applied when, as here, illegal police action precedes a defendant's consent to search. The court stated, "When illegal police action precedes a defendant's consent to search, the defendant's later consent may dissipate the taint of the police illegality. On the other hand, the police illegality may fatally taint the consent." *People v. Rodriguez, supra,* 945 P.2d at 1364 (citing *Florida v. Royer,* 460 U.S. 491, 507–08, 103 S.Ct. 1319, 1329–30, 75 L.Ed.2d 229 (1983), and *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)).

The *Rodriguez* court held that evidence obtained by a purported consent that followed improper conduct by police is admissible "only if it is determined that the consent was both voluntary and not an exploitation of

the prior illegality," and that "[e]ven if a defendant's consent is voluntary, then the evidence will not be admissible unless the consent represents 'an act of free will [sufficient] to purge the primary taint' of police illegality." *People v. Rodriguez, supra,* 945 P.2d at 1364 (quoting *United States v. Melendez–Garcia,* 28 F.3d 1046, 1055 (10th Cir. 1994), and *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963)).

■ The prosecution bears the burden of proving both attenuation and voluntariness when seeking admission of evidence discovered during a consensual search. *People v. Rodriguez, supra.*

In *Rodriguez,* the court concluded as a matter of law that no intervening circumstances occurred between the illegal arrest of the defendant and his consent to the search of his vehicle, explaining, "[T]he proximity of the arrest and the consent was immediate. With the same breath the trooper told Rodriguez he was free to go and requested consent to search ...." *People v. Rodriguez, supra,* 945 P.2d at 1364. The court also looked at the conduct of the police, stating, "The detectives embarked upon this expedition for evidence in the hope that something might turn up." *People v. Rodriguez, supra,* 945 P.2d at 1365.

Another relevant factor the *Rodriguez* court pointed to, which "call[ed] into question the purpose of this prolonged detention," was that "the troopers requested a drug detection dog, perhaps as early as the roadside detention, but clearly well before the request for the 'consent to search' was given." *People v. Rodriguez, supra,* 945 P.2d at 1365.

Although the detention in *Rodriguez* was considerably longer than the detention before us, these factors provide guidance, and the record here shows that (1) the only intervening circumstance that occurred between the illegal detention of Bush and her consent to the search of her vehicle was Bush's request to get on her way; and (2) the troopers set out to find the vehicle accompanied by a drug detection dog well before the car was stopped and the request for the consent to search was given.

In *People v. Redinger, supra,* the Colorado Supreme Court cited *United States v. McSwain,* 29 F.3d 558 (10th Cir.1994), with approval. *McSwain* involved a defendant's voluntary consent to search a vehicle in the context of an unlawful detention, and the facts there are also remarkably similar to those before us.

In *McSwain,* a Utah officer stopped a car because it appeared not to have valid license plates or a temporary registration sticker. As the officer approached the car, he saw a valid temporary registration sticker on the rear window. The *McSwain* court held that, once the officer saw the valid sticker, reasonable suspicion regarding the validity of the vehicle's registration ceased to exist.

Nevertheless, the officer proceeded to ask for McSwain's identification and license and questioned him about drugs, weapons, and alcohol. The officer also asked McSwain for permission to search his vehicle, which McSwain granted, and contraband was found in the trunk of the car.

In *McSwain,* as here, the trial court found that the defendant voluntarily consented to the search and denied his motion to suppress. The Tenth Circuit Court of Appeals reversed, concluding the trial court's finding was insufficient "because the court incorrectly found that the protracted detention of Mr. McSwain was lawful and therefore did not conduct the *Brown* 'taint analysis.' " *United States v. McSwain, supra,* 29 F.3d at 562; *see People v. Rodriguez, supra,* 945 P.2d at 1364. As the courts noted in both *McSwain* and *Rodriguez,* the "taint analysis" is necessary to determine whether the defendant's later consent may dissipate the taint of the police illegality, and the courts in both cases conducted their own taint analyses. *United States v. McSwain, supra,* 29 F.3d at 562 ("We conduct the taint analysis here 'because the proceedings below resulted in a record of amply sufficient detail and depth from which the determination may be made.' " (quoting *United States v. Fernandez,* 18 F.3d 874, 881–82 (10th Cir.1994))).

As in *Rodriguez,* the court in *McSwain* concluded the defendant's consent did not dissipate the taint of the police illegality:

After Mr. McSwain denied having any contraband in the vehicle, Trooper Avery asked, "Do you mind if I look," to which Mr. McSwain replied, "Go ahead." Trooper Avery's manner was pleasant and he did not use an insisting tone of voice. However, several elements suggesting lack of voluntariness were present. Though possibly not designed to coerce or intimidate, Trooper Avery was leaning over and resting his arms on the driver's door when he asked for consent to search. Additionally, though Trooper Avery's return of . . . Mr. McSwain's identification and the vehicle registration may be a factor indicating that Mr. McSwain was free to leave, Trooper Avery failed to specifically inform Mr. McSwain that he was free to leave the scene or that he could refuse to give his consent. These are "important factors in our consideration."

*United States v. McSwain, supra,* 29 F.3d at 563 (quoting *United States v. Fernandez, supra,* 18 F.3d at 882; citation and footnote omitted); *see United States v. Ward,* 961 F.2d 1526, 1533 (10th Cir.1992)(advising an individual of the right to refuse consent is important because it shows the individual that the police officer is prepared to respect the assertion of that right), *abrogated on other grounds by United States v. Little,* 18 F.3d 1499 (10th Cir.1994).

Here, as in *McSwain,* Trooper Hunter's questioning and detention of Bush continued after any objective reason for the investigatory stop ceased, and despite her request to resume her journey. Although the trial court did not conclude that the continued detention and questioning of Bush was illegal, as we have concluded earlier, it found there was no objective reason for further detention. Also, as in *McSwain,* the trial court here found that Bush consented to the search of the car, but it failed to determine whether that consent was tainted by the prior illegal detention.

Accordingly, as the courts did in *McSwain* and *Rodriguez,* we conduct our own taint analysis because we conclude the proceedings in the trial court "resulted in a record of amply sufficient detail from which the determination may be made." *See United States*

*v. McSwain, supra,* 29 F.3d at 562. After doing so, we note the following.

First, when Trooper Hunter returned Bush's paperwork to her, he told her to "[p]lease slow down, get an insurance card, and have a safe trip," but he admitted he did not step aside to let her pass directly to her vehicle, nor did he explicitly inform her that she had the right to refuse consent and leave. Second, at the time of this conversation, Bush was outside her car and separated from her passengers, standing on the side of the highway between Hunter's vehicle and hers. Third, in response to Hunter's first request to search, Bush expressed a desire to continue on to Denver, but instead of respecting or even acknowledging her right to do so, Hunter continued requesting that she consent to a search.

Fourth, Hunter's questioning of Bush occurred immediately before Hunter's request that she consent to the search. There were no intervening events and virtually no time lapsed between the illegal detention and her consent to the search of the car. Thus, there was nothing to purge the prior illegality.

We therefore conclude that Bush's consent to the search of the car was tainted by the prior illegal detention, which we have concluded began amidst Bush's tears and expressed desire to resume her journey, and that the trial court erred in denying defendant's motion to suppress evidence.

Given our conclusion, we do not address defendant's arguments that he was the victim of racial prejudice, that he had the right to deny consent to the search, that the search of the interior of the car with a drug sniffing dog exceeded Bush's consent, that he had the right to limit the scope of Bush's consent, and that certain evidence used to prove the habitual offender counts was inadmissible.

The judgment and sentence are reversed, and the case is remanded for a new trial in accordance with the views expressed in this opinion.

Judge VOGT and Judge WEBB concur.