The PEOPLE of the State of Colorado, Plaintiff–Appellee,

v.

Alejandro GARCIA, Defendant–Appellant.

No. 09CA0167.

Colorado Court of Appeals, Div. IV.

Sept. 30, 2010.

John W. Suthers, Attorney General, Rebecca A. Adams, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Walta, Gehring, Harms, & Dingle LLC, Christopher H. Gehring, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge MILLER.

Defendant, Alejandro Garcia, appeals the judgment of conviction entered upon a jury verdict finding him guilty of possession with intent to sell or distribute marijuana and possession of eight ounces or more of marijuana and designating him as a special offender (possession of over 100 pounds). He also appeals the sentence imposed. We affirm in part, vacate in part, and remand to the trial court for correction of the mittimus.

## I. Background

While driving a pick-up truck with a passenger eastbound on Interstate 76, defendant was stopped by a Colorado State Patrol officer who observed him making an unsafe lane change. During the stop, the officer called for the assistance of a "K–9" officer with a drug-sniffing dog. With the aid of the dog, the officers discovered 481 pounds of marijuana in the truck bed. After a jury trial, defendant was convicted as described above and sentenced to twenty-four years in the Department of Corrections on each count, to be served concurrently. The trial court also sentenced him to five years of mandatory parole on the possession with intent conviction and to a period of mandatory parole "as required by statute" on the possession of eight ounces or more conviction.

On appeal, defendant argues that the trial court erred by (1) allowing the hearing on the motion to suppress evidence of the marijuana discovered in the truck to commence before defendant's late arrival, (2) denying the motion to suppress, (3) failing to merge the possession and possession with intent to sell or distribute convictions, and (4) imposing five years of mandatory parole. We disagree with the first and second contentions but agree with the third and fourth.

## II. Analysis

### A. Did the Trial Court Err by Allowing the Suppression Hearing to Proceed Before Defendant's Late Arrival?

The trial court issued a Case Management Order on June 4, 2007 setting a hearing on all pretrial motions for September 5, 2007. On August 6, 2007 defendant moved to suppress evidence of the marijuana discovered in the truck, contending that the officers lacked reasonable suspicion or probable cause to conduct the search. At the outset of the September 5 hearing, defense counsel advised the court that defendant had not yet arrived, because he had gotten lost while en route, but was expected soon. The court responded, "[Y]our client needs to be here, so let's go ahead and pass on it for right now." Defendant's counsel then said,

> I can proceed without it. Because I would even have considered waiving his appearance, because he's not going to testify. And it's really—it's really legal issues that we're talking about. And it's really—it's the People's burden, in terms of the issue in the case and their witness.

The trial court responded, "Let's go ahead and let's get it going." After the officer who made the stop testified, the court took a brief recess. At the conclusion of the recess, the court and defendant's counsel noted that defendant had arrived and was present in the courtroom. The K–9 officer then testified for the prosecution. Defendant's counsel had no questions for that witness and called no witnesses. The trial court then denied the motion.

■ A defendant has a right to be present at all critical phases of a criminal trial, including a suppression hearing. *People v. Harris,* 914 P.2d 434, 437 (Colo.App.1995). This right is guaranteed by due process "if the fundamental fairness of the proceeding would be undermined by the defendant's absence." *People v. Isom,* 140 P.3d 100, 104 (Colo.App.2005).

■ Thus, due process requires that a defendant be present to the extent that a fair and just hearing would be thwarted by his or her absence. *People v. Gallegos,* 226 P.3d 1112, 1120 (Colo.App.2009) (citing *Luu v. People,* 841 P.2d 271, 275 (Colo.1992)). A defendant's presence is not required for due process if it would be useless or only slightly beneficial. *Id.; see also* Crim. P. 43(c)(2) (defendant's presence not required at a conference or argument on a question of law). Accordingly, defendant must establish how his absence from a portion of the hearing affected his ability to defend against the charges. *Gallegos,* 226 P.3d at 1120; *Harris,* 914 P.2d at 437.

■ Because neither defendant nor his counsel asserted a contemporaneous objection on this issue, we review for plain error. *See People v. Munsey,* 232 P.3d 113, 120 (Colo.App.2009). Plain error is error that is both obvious and substantial and that so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the conviction. *People v. Miller,* 113 P.3d 743, 750 (Colo.2005).

■ We do not consider the People's contention that defendant waived his right to be present for the entire hearing by virtue of his counsel's statement and his own tardiness because we conclude that defendant was not prejudiced by his late arrival. Specifically, the record establishes that

- Defendant's counsel advised the trial court at the outset of the hearing that he did not intend to call defendant to testify, and he did not do so even after defendant arrived.
- Defendant arrived during a brief recess after the testimony of the prosecution's first witness. Thus, while he missed the testimony of the first officer, he was present during the entire testimony of the K–9 officer, the arguments of counsel, and the court's ruling from the bench.
- Defendant had previously reviewed with his counsel the first officer's report, which was relied upon during the officer's testimony.
- Defendant could have discussed the first officer's testimony with his counsel during the recess.
- Defendant's counsel did not request a longer recess to confer with his client.
- Defendant's counsel did not ask to recall the first officer.

Finally, defendant has not identified specific examples of anything that he or his counsel might have said or done had he been present during the first part of the hearing.

Accordingly, we conclude that commencing the suppression hearing before defendant's late arrival did not so undermine the fundamental fairness of his trial as to cast serious doubt on the reliability of his conviction.

### B. Did the Trial Court Err in Denying the Suppression Motion?

The trial court found the following facts at the suppression hearing. On January 17, 2007, the first officer, while conducting routine patrol on Interstate 76, observed an eastbound pick-up truck bearing Iowa plates change lanes without signaling. The officer directed the truck to the side of the highway and asked defendant, the driver, for his driver's license, proof of insurance, and registration papers. Defendant promptly provided the documents with the assistance of his male passenger. Defendant had an Arizona license showing that he resided in Tucson, Arizona. The officer then inquired as to the owner of the vehicle. Defendant responded slowly, but ultimately indicated that the truck belonged to a friend.

Because the officer, who had extensive training and experience in drug investigations, was concerned by the lack of knowledge about ownership of the truck, he asked defendant to step outside. The officer again asked who owned the truck. After a long pause, defendant reiterated that the truck

was owned by a friend. When the officer asked for the name of the friend, defendant responded that he was actually a friend of the passenger. The officer then asked for the name of the passenger, and after another pause defendant gave the passenger's first name but could not provide his last name. In response to further questioning, defendant said they were headed to Iowa, but could not provide an address, and indicated they would be gone for a week.

The officer then questioned the passenger, who also was hesitant in his responses and could not identify the owner by name or the owner's address or phone number. The passenger said they were returning the truck to the owner. When asked how they would do that without knowing the owner's address or phone number, defendant and the passenger said that they planned to call the owner's uncle to reach the owner.

The officer ran a check on the driver's license and the registration, which revealed no warrants or criminal history for defendant and no reports that the truck had been stolen. He returned the documents to defendant, gave him a verbal warning about the lane change violation, and told him he was free to go. The officer testified that at that point he had no problem with defendant, the passenger, and the truck leaving the scene.

However, after defendant took two or three steps toward the truck, the officer asked if they could talk further. Defendant responded, "Yeah, sure," and walked back toward the officer. The officer said he had concerns that the story provided by defendant and the passenger did not make sense. He asked defendant and the passenger if they had narcotics or weapons in the truck, specifically mentioning marijuana, methamphetamine, cocaine, and heroin, and both told him they did not. The officer then separately provided defendant and the passenger with copies of a state patrol form consenting to a search of the vehicle. They both declined consent.

At this point, the officer told them that, based upon his training and experience, they were free to leave but that the truck would have to stay for a K–9 unit to conduct a narcotic dog search. The officer offered to let them make a phone call or to arrange for them to have a ride into the nearest town. Defendant and the passenger said they wanted to wait with the truck.

The K–9 officer arrived with the dog between fourteen and twenty minutes after the initial contact. The first officer asked the K–9 officer to have the dog perform a free air sniff around the truck. In the course of walking around the vehicle, the dog "alerted" by aggressively scratching at the tailgate, indicating the presence of narcotics. The K–9 officer rolled back the cover on the bed of the truck and the officers discovered the marijuana.

At the conclusion of the hearing, the trial court made detailed findings of fact on the record and denied the motion. It concluded that the officer who made the stop had reasonable suspicion of a traffic violation to justify the initial investigatory stop and that under the totality of the circumstances the officer had suspicions that were not unreasonable justifying the detention of the truck that resulted in the discovery of the marijuana.

■ The Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution protect persons from unreasonable searches and seizures of their person, home, papers, and effects. *People v. Ortega*, 34 P.3d 986, 990 (Colo.2001).[1] Article II, section 7 affords broader protections in some instances than does the Fourth Amendment. *People v. Haley*, 41 P.3d 666, 671 (Colo.2001). As relevant here, our supreme court has held that a dog sniff search of a vehicle in connection with a traffic stop that is prolonged beyond its purpose to conduct a drug investigation

1. While we recognize a potential question whether defendant has a sufficient possessory interest in the truck to assert a Fourth Amendment right to be free from an unlawful search of the vehicle, the People did not raise that issue in the trial court or their brief on appeal. We do not perceive that this case presents the "exceptional circumstances" that would justify our taking up the issue sua sponte, and we therefore decline to consider it. *See Moody v. People*, 159 P.3d 611, 615 (Colo.2007).

intrudes upon a reasonable expectation of privacy and therefore requires reasonable suspicion of criminal activity. *Id.* at 672.

■ Reasonable suspicion represents a lesser standard than probable cause, which is generally required before a law enforcement officer may seize personal property. *People v. Tallent,* 174 P.3d 310, 313 (Colo.2008). A prudent officer acting with a reasonable, articulable suspicion that a person has been, is, or is about to be engaged in criminal activity may detain personal property for temporary investigatory purposes. *Id.* Therefore, to satisfy its burden on defendant's suppression motion, the prosecution was required to show that the officer acted on specific and articulable facts, which, when taken together with reasonable inferences from those facts, gave rise to reasonable suspicion. *Haley,* 41 P.3d at 674.

■■ In considering whether reasonable suspicion exists, the court looks at the totality of the circumstances, the specific and articulable facts known to the officer at the time of the encounter, and the rational inferences to be drawn from those facts. *People v. Rodriguez,* 945 P.2d 1351, 1359 (Colo. 1997). Objective standards of reasonableness must guide the court's inquiry; the officer's subjective assessment of the facts may assist the court in understanding the situation confronting the officer, but his or her motives do not defeat the propriety of an objectively reasonable search. *People v. Ramos,* 13 P.3d 295, 297 (Colo.2000).

■ We review the trial court's ruling on the suppression motion by deferring to its findings of fact and analyzing its applications of legal standards to those facts de novo. *People v. Kazmierski,* 25 P.3d 1207, 1210 (Colo.2001).

■ Defendant does not contest the validity of the initial traffic stop. The uncontroverted facts establish that defendant failed to properly signal his change of lanes. The officer therefore properly required that defendant produce his driver's license, a registration for the truck, and proof of insurance.

Two discrepancies immediately jumped out of the papers produced. First, defendant had an Arizona driver's license, but the truck bore Iowa plates. Second, the truck was registered in the name of someone other than defendant or the passenger. The officer's suspicions were further heightened by the following facts:

- Defendant and the passenger did not know the owner's name, despite being in the middle of an extended journey from Tucson, Arizona to an unknown location in Iowa.
- Neither knew the owner's address or phone number.
- Neither could identify their destination other than "Iowa."
- They offered no plan for how they would connect with the owner other than to call the owner's uncle at some point.
- Defendant did not even know the last name of the passenger.

While some of these facts might well be taken as innocent in isolation or even in combination with one or two others, we conclude that the totality of the circumstances supports the existence of reasonable suspicion to detain the truck and conduct the dog sniff.

Defendant contends that the supreme court's decision in *Haley* controls, compelling the conclusion that the officer lacked reasonable suspicion and acted merely on a hunch. We disagree.

In *Haley,* an officer observed a vehicle following a truck too closely and conducted a traffic stop. 41 P.3d at 669. In response to the officer's request, the driver produced a valid license and proof he was entitled to operate the vehicle (in the form of a registration and rental agreement), and the officer returned the paperwork and told the driver he was free to go. Without asking the driver if he was willing to answer further questions, the officer then asked whether there were drugs or anything else in the vehicle. The driver said no, consented to a dog sniff of the luggage, but refused to consent to a dog sniff of the car. *Id.* The driver placed the luggage five feet from the car, but the dog did not alert to the bags. Over the protests of

the driver, the officer then took the dog to the outside of the car, and the dog alerted to several areas outside the car. The officer called in other officers, and searches of the driver and passengers resulted in the discovery of illegal drugs. *Id.* at 670.

The supreme court concluded that the facts known to the police justified a reasonable suspicion for the initial stop but not for the dog sniff of the car. *Id.* at 677. The police relied on five facts, none of which, in the opinion of the court, supported the existence of reasonable suspicion. First, the officer who initiated the stop found it strange that the driver and the two passengers flew on a one-way ticket from Kansas City to Sacramento but then rented a car for $600 to drive back, rather than fly. The court concluded that their choice of means of travel did not lend support to reasonable suspicion. *Id.* at 675. Second, the officer observed that all three occupants of the car exhibited nervousness. The court rejected that observation because it is not uncommon for citizens, regardless of innocence, to show signs of nervousness when confronted by a police officer. *Id.* Third, the officer characterized California as a drug source, but the court noted that the record included no evidence identifying Sacramento, as opposed to San Diego or other communities close to an international border, as a drug source. *Id.*

Fourth, the prosecution argued that the passengers' failure to identify where they were going was suspicious. The supreme court concluded, however, that one never responded and the other hesitated before agreeing with the officer's suggestion they were going home: "This was a consensual interview. [The passengers'] silence or hesitation in responding is not an inconsistency supporting reasonable suspicion." *Id.* at 676. Finally, the court concluded that the driver's denial of permission to search the car could not form any part of a basis for reasonable suspicion. *Id.*

The facts in this case differ in some significant respects. Defendant never provided evidence that he was authorized to drive the car. Neither he nor the passenger knew who owned the car or how to reach or find the owner other than to call his uncle (whose address was also unknown). Defendant did not know the last name of his passenger. Under the totality of the circumstances, the officer had a sufficient basis for reasonable suspicion of criminal activity involving defendant and the truck.

Defendant argues that the officer was precluded from investigating further once he told defendant he was free to go, citing *Haley.* There, the supreme court stated, "Once a driver produces a valid license and *proof that he is entitled to operate the vehicle,* he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning." 41 P.3d at 673 (emphasis added).

Here, defendant did not provide proof that he was entitled to operate the truck. Such proof might be rare where a vehicle was borrowed, as asserted here, rather than rented, as in *Haley.* But defendant and the passenger did not know the name of the owner, where he lived, or how to reach him, except through an uncle whose whereabouts were also unknown. Thus, *Haley* did not prevent the officer from continuing to investigate, first through consensual questioning and subsequently through the dog sniff, because the totality of the circumstances viewed objectively supported the reasonableness of the officer's suspicions. *See Rodriguez,* 945 P.2d at 1360–61 (even though driver produced a valid license and a valid registration card, other evidence providing reasonable suspicion the car may have been stolen justified further investigation).

The officer's testimony at the suppression hearing that when he returned the papers he had no problem with the driver and vehicle leaving the scene does not preclude the existence of reasonable suspicion. To the contrary, our supreme court has made clear that in reviewing an officer's conduct in making an investigatory stop, a court must base its decision on an objective analysis of the facts rather than the subjective intent of the officer. *Id.* at 1359–60; *see also Ohio v. Robinette,* 519 U.S. 33, 38, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996).

Defendant's denial of having contraband and refusal to consent to a search during the

consensual interview did not give rise to reasonable suspicion. Nevertheless, the objective factors discussed above that were known to the officer before the consensual questioning provided a sufficient basis for reasonable suspicion, and the officer could properly have detained the truck for a reasonable period of time. *See United States v. Fuse,* 391 F.3d 924, 929 (8th Cir.2004) (rejecting defendant's argument that a police officer's termination of a traffic stop, by returning the defendant's documents to him and telling him to have a safe trip, effectively erased the officer's objectively reasonable suspicions developed during the stop and prevented reliance on those suspicions to support a subsequent detention for a dog sniff); *United States v. Williams,* 271 F.3d 1262, 1271 (10th Cir.2001) (rejecting the defendant's argument that the return of his documentation negates an officer's objectively reasonable suspicions developed during a traffic stop; "the relevant inquiry in this case is based on the objective facts known to the officer, not upon the officer's subjective state of mind"); *see also People v. Brandon,* 140 P.3d 15, 20 (Colo. App.2005) (lengthening a detention beyond that related to the initial encounter is permissible if the officer has an objectively reasonable and articulable suspicion that criminal conduct has occurred or is occurring).

■■■ However, an investigatory stop supported by reasonable suspicion is necessarily temporary and limited in scope. *Tallent,* 174 P.3d at 313. Here, at the conclusion of the consensual questioning, the officer told defendant that while he and the passenger were free to leave, the truck would have to remain pending the arrival of the K–9 unit to conduct a dog sniff for narcotics. In determining whether the limits of an investigatory stop have been exceeded, courts must consider the length of the detention, whether the officer diligently pursued the investigation during the detention, whether the suspect was required to move from one location to another, and whether there were alternative, less intrusive means available and whether the police acted unreasonably in failing to pursue them. *Rodriguez,* 945 P.2d at 1362.

■■■ Applying these factors to this case, we conclude that the length of detention was appropriately brief, with the entire encounter lasting between fourteen and twenty minutes from the initial contact to the arrival of the K–9 unit. *See Ortega,* 34 P.3d at 993 (twenty to thirty-minute detention based on reasonable suspicion upheld); *see also United States v. Sharpe,* 470 U.S. 675, 683, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (twenty-minute detention held reasonable); *Williams,* 271 F.3d at 1265 (upholding fifteen-minute detention on reasonable suspicion). There is no suggestion that the officer delayed or failed to act diligently, and the K–9 unit arrived shortly after defendant was advised the truck would be held for a dog sniff. *Cf. Rodriguez,* 945 P.2d at 1362–63 (instead of searching for a van's vehicle identification number on the side of the interstate highway or at a nearby exit, the trooper required the defendant to drive an additional ten miles in the opposite direction). Apart from the officer's request to speak to defendant outside the car, defendant was not required to move to another location. *Cf. id.*

Accordingly, we conclude that the trial court did not err in denying the motion to suppress on the basis that the officer had reasonable suspicion to detain the truck and conduct the dog sniff.

C. Did the Trial Court Err in Failing to Merge Defendant's Convictions for Possession of Marijuana and Possession with Intent to Sell or Distribute?

Defendant was convicted of possession of marijuana with intent to sell or distribute in violation of the applicable version of section 18–18–406(8)(b), H.B. 92–1015, sec. 1, 1992 Colo. Sess. Laws 358, and possession of eight ounces or more of marijuana, in violation of the applicable version of section 18–18–406(4)(b)(I), H.B. 92–1015, sec. 1, 1992 Colo. Sess. Laws 358. *Cf.* § 18–18–406, C.R.S.2010 (statute comprehensively amended effective Aug. 11, 2010). He contends that the possession conviction was a lesser included charge of the possession with intent conviction and therefore should have merged into the possession with intent conviction. We agree.

As a general matter, the imposition of multiple punishments for a greater and a lesser included offense is barred by the Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and article II, section 18 of the Colorado Constitution, by statute, and by the judicially-created rule of merger. *People v. Leske,* 957 P.2d 1030, 1035 (Colo.1998) (citing *Armintrout v. People,* 864 P.2d 576, 578–79 (Colo.1993)). Here, we consider only the statutory bar because we conclude that section 18-1-408, C.R.S.2010, requires merger of the two convictions. Because the statutory test requires comparison of the statutory elements of the two offenses, we must engage in statutory construction. The interpretation of these statutes presents a question of law, which we review de novo. *See Hendricks v. People,* 10 P.3d 1231, 1235 (Colo.2000); *see also People v. Hogan,* 114 P.3d 42, 57 (Colo.App.2004) (reviewing merger issue de novo).

Section 18-1-408(1)(a) provides that a defendant may not be convicted of more than one offense if "[o]ne offense is included in the other as defined in subsection (5) of this section." Pursuant to subsection (5)(a), an offense is "included" in another when "[i]t is established by proof of the same or less than all the facts required to establish the commission of the offense charged." *See Leske,* 957 P.2d at 1035. This provision requires a court to compare the statutory elements of the offenses at issue, rather than the evidence presented at trial, to determine whether an offense is lesser included. The supreme court has explained, "Under this 'strict elements test,' ... if proof of the facts establishing the statutory elements of the greater offense necessarily establishes all of the elements of the lesser offense, the lesser offense is included for purposes of section 18-1-408(5)(a)." *Leske,* 957 P.2d at 1036.

In comparing the substantive elements of the charged offenses for merger analysis, we do not consider penalty enhancers. *Id.* at 1039 (proof the victim was under fifteen years of age merely served to enhance the sentence for the offense of a sexual assault on a child (defined as a person under the age of eighteen) by a person in a position of trust and was not a necessary element of that offense); *Armintrout,* 864 P.2d at 578–80 (proof that building burgled was a "dwelling" enhanced the sentence but did not establish a required element for a second degree burglary conviction for purposes of determining whether second degree burglary is a lesser included offense of first degree burglary); *People v. Lovato,* 179 P.3d 208, 212 (Colo.App.2007) (robbery of an at-risk adult enhanced the form of robbery but did not constitute a separate offense preventing that offense from being a lesser included offense of aggravated robbery).

Here, defendant was convicted of violating former section 18-18-406(8)(b)(I), which made it unlawful for any person to knowingly possess marijuana with intent to sell or distribute, and former section 18-18-406(4)(b), which provided that any person who possesses eight ounces or more of marijuana commits a class 5 felony. Proof of the elements of the first, or greater offense, necessarily establishes all of the prerequisites of the second or lesser offense, with the exception of the required quantity.

However, the eight-ounce or more quantity requirement is merely a sentence enhancer and not an essential element. Former section 18-18-406 made the possession of any quantity of marijuana a crime, with the severity of the crime dependent on the quantity possessed. Thus, possession of not more than one ounce was a class 2 petty offense (subsection (1)); possession of more than one ounce but less than eight ounces rose to a class 1 misdemeanor (subsection (4)(a)(I)); and possession of eight ounces or more constituted a class 5 felony (subsection (4)(b)(I)).

The People argue that *People v. Benson,* 124 P.3d 851, 855–56 (Colo.App.2005), precludes merger. In that case, the defendant was convicted of possession of eight or more ounces of marijuana, as in this case, and also of cultivation of marijuana in violation of former section 18-18-406(8)(a)(I) (repealed effective Aug. 11, 2010). The division concluded that the elements of the offenses were not identical because the offense of possession of eight or more ounces requires proof that the defendant possessed a certain quantity of marijuana, an element not included in the cultivation offense. However, the decision

did not discuss whether the quantity requirement constituted a sentence enhancer, rather than a substantive element of the possession offense, and did not cite to *Leske, Armintrout,* or other decisions holding that sentence enhancers do not constitute substantive elements. To the extent the division's opinion is inconsistent with this opinion, we elect not to follow it. *See City of Steamboat Springs v. Johnson,* 252 P.3d 1142, 1147 (Colo.App. 2010) (a division of the court of appeals is not bound to follow another division's ruling).

We therefore conclude that the trial court should have merged the possession conviction into the possession with intent conviction. We vacate defendant's conviction and sentence for possession of marijuana, and we remand to the trial court with directions to correct the mittimus accordingly.

### D. Did the Trial Court Err by Imposing Five Years of Parole?

The trial court sentenced defendant to five years of mandatory parole at the conclusion of his incarceration in the Department of Corrections on his conviction for possession with intent to sell or distribute marijuana. Defendant contends, the People concede, and we agree that the trial court lacked authority to impose more than three years of mandatory parole.

The offense of possession with intent to sell or distribute marijuana constituted a class 4 felony under former section 18–18–406(8)(b)(III)(A), and section 18–1.3–401(1)(a)(V)(A), C.R.S.2010, dictates that the specified mandatory period of parole for that class of felony is three years. Defendant was designated a special offender for possession of over 100 pounds of marijuana, pursuant to section 18–18–407(1)(e), C.R.S.2010. That designation required the court "to sentence the defendant to the department of corrections for a term of at least the minimum term of years within the presumptive range for a class 2 felony but not more than twice the maximum term of years within the presumptive range for a class 2 felony." This statute is silent, however, on the subject of parole. We therefore conclude that the plain language of the statute does not authorize the trial court to enhance the mandatory

parole sentence. *People v. Butler,* 224 P.3d 380, 388 (Colo.App.2009).

We therefore vacate this part of defendant's sentence and remand with instructions for the trial court to correct the mittimus to show a mandatory period of parole of three years on the only remaining conviction.

### III. Conclusion

The judgment and sentence for defendant's conviction of possession of eight ounces or more of marijuana are vacated; the portion of the sentence imposing five years of mandatory parole for his conviction for possession with intent to sell or distribute is vacated; the judgment and remaining sentence are affirmed in all other respects; and the case is remanded to the trial court with directions to correct the mittimus to reflect the conclusions in this opinion.

Judge BOORAS concurs.

Judge WEBB specially concurs.

Judge WEBB specially concurring.

Before denying Garcia's motion to suppress, the trial court observed, "the Fourth Amendment has been eroded significantly from the days that I was in law school from '73 to '76." While I agree with the majority that existing law dictates denial of the motion, I write separately to amplify the trial court's concern and suggest a solution.

Traffic stops that ripen into lawful searches for drugs frequently involve the following progression:

- A traffic stop is made based on probable cause. *People v. Cherry,* 119 P.3d 1081, 1083 (Colo.2005) ("[t]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred").

- Because no information surfaces during the stop that creates reasonable suspicion of other criminal conduct, it is not prolonged beyond its necessary purposes. *People v. Cervantes–Arredondo,* 17 P.3d 141, 147 (Colo.2001) ("The officer may detain the driver long enough to check his driver's license and vehicle reg-

istration and to issue a citation. The stop usually must 'last no longer than is necessary to effectuate the purpose of the stop,' and the 'scope of the detention must be carefully tailored to its underlying justification.'" (citations omitted)).

- Once the stop has concluded, the motorist is told that he or she is free to leave. *People v. Brandon,* 140 P.3d 15, 18 (Colo. App.2005) ("[O]nce a driver produces a valid license and proof that he or she is entitled to operate the vehicle, the driver 'must be allowed to proceed on his [or her] way, without being subject to further delay by police for additional questioning.'").

- Nevertheless, the officer then extends the stop by engaging the motorist in a consensual encounter, and sometimes thereby obtains additional information establishing reasonable suspicion. *Cervantes–Arredondo,* 17 P.3d at 147 ("[F]urther questioning is permissible if the initial detention becomes a consensual encounter.").

Consistent with this pattern, the traffic stop here ended with the officer returning Garcia's papers, giving a verbal warning, and telling him that he was free to go. The officer testified that he then had no problem with Garcia, the passenger, and the truck, leaving the scene. When Garcia began to do so, however, the officer—who also testified that he had been trained "how to develop reasonable suspicion during the course of a traffic contact"—asked if Garcia would be willing to answer additional questions. The officer did not testify that he told Garcia that he was free to refuse the request.

Because "[o]bjective standards of reasonableness guide our inquiry," *People v. Ramos,* 13 P.3d 295, 297 (Colo.2000), whether the officer did so only to buy time until the K–9 unit arrived is beyond our purview. Regardless, but for Garcia's acquiescence, he would have driven off, the truck would not have been searched, and the evidence on which he was convicted would not have been discovered. Thus, the majority's conclusion that the officer could have held Garcia based on reasonable suspicion ignores that what kept Garcia at the scene—directly leading to the search, his arrest, and his conviction—was the consensual encounter, not reasonable suspicion.

Under the Fourth Amendment, on these facts nothing more could be said of the denial than "affirmed." *See, e.g., United States v. Williams,* 271 F.3d 1262, 1271 (10th Cir.2001) ("[T]he officer's indication to [the defendant] that he was free to leave bears no significance in our determination of whether the officer had reasonable suspicion to detain [the defendant].").

But Garcia's right to be free from an unreasonable search and seizure was also protected by Article II, Section 7 of the Colorado Constitution. This provision offers greater protection than the Fourth Amendment. *See, e.g., People v. Haley,* 41 P.3d 666, 671 (Colo.2001). In my view, extending the protection of Article II, Section 7 is warranted here for the following three reasons.

First, because a consensual encounter is merely a request for "voluntary cooperation" through noncoercive questioning, an officer may initiate this contact despite lack of probable cause or reasonable suspicion. *People v. Heilman,* 52 P.3d 224, 227 (Colo.2002). But where an officer has lawfully seized a motorist, the officer's "inquiries into matters unrelated to the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson,* 555 U.S. 323, 788, 129 S.Ct. 781, 788, 172 L.Ed.2d 694 (2009). Thus, after such expansive questioning has run its course and the traffic stop ended, whether any objectively legitimate purpose exists for which voluntary cooperation could be sought is dubious.

Second, if questioning during the stop has not produced reasonable suspicion for protracting it, allowing officers further to question motorists unfairly disadvantages them because they may well be unaware that the traffic stop has ended. *Cervantes–Arredondo,* 17 P.3d at 147 ("The transition between a detention and a consensual exchange can be seamless. Most citizens would not recognize the transition and would not feel free to

terminate the encounter absent a clear endpoint to the investigative detention." (internal citations omitted)). This disadvantage is exacerbated because while "[i]nherent social pressure to cooperate with the police is not itself a sufficient basis for declaring the encounter nonconsensual," *Heilman*, 52 P.3d at 228, the officer need not tell the motorist that he or she is free to decline the officer's request and leave the scene. *See People v. Melton*, 910 P.2d 672, 677 (Colo.1996); *People v. Paynter*, 955 P.2d 68, 72 (Colo.1998).

Third, although Colorado courts have sometimes excluded evidence seized as a result of traffic stops protracted by consensual encounters under the "totality of the circumstances," this approach is "necessarily imprecise." *Heilman*, 52 P.3d at 228 (internal quotation omitted); *see, e.g., People v. Johnson*, 865 P.2d 836, 844 (Colo.1994) (length of further questioning); *People v. Castaneda*, 187 P.3d 107, 109 (Colo.2008) (questioning on the same subject as interrogation during the traffic stop); *Brandon*, 140 P.3d at 20 (continued questioning despite motorist's statements that she wanted to leave). These criteria lack sufficient precision to protect motorists or guide police.[1]

"[E]xtending rights protected under our state constitution beyond those protected by the federal constitution has been largely within the domain of the supreme court." *People in Interest of A. C.*, 991 P.2d 304, 307 (Colo.App.1999), *aff'd*, 16 P.3d 240 (Colo. 2001). The supreme court, either on certiorari review of this case or of a case that presents the same sequence of events, could level the playing field by adopting a brightline rule that Article II, Section 7 prohibits officers from initiating consensual encounters solely to continue questioning motorists who have been seized and then told they may be on their way, unless the officer tells the motorist that cooperation is strictly voluntary.

---

1. The same is true of courts in other states that have focused on the officer's conduct rather than their words. *See, e.g., Daniel v. State*, 277 Ga. 840, 597 S.E.2d 116, 122 (2004) ("[E]ven after a driver has been expressly advised that he or she is free to leave, an officer's subsequent actions may be so inconsistent with that advice that a reasonable person could conclude that the advice was no longer operative."), *abrogated by Salmeron v. State*, 280 Ga. 735, 632 S.E.2d 645, 647 (2006); *Commonwealth v. Freeman*, 563 Pa. 82, 757 A.2d 903, 907 (2000) ("Since the trooper had accomplished the purpose of the stop, as he expressly indicated, [the defendant] would have been entirely within her rights to drive away at that point. Nevertheless, the trooper's subsequent actions were inconsistent with his statement to [the defendant] that she was free to leave...."); *Reittinger v. Commonwealth*, 260 Va. 232, 532 S.E.2d 25, 28 (2000) ("Although [the deputy] had told [the defendant] that he was free to go, we think that the events that transpired immediately thereafter would suggest to a reasonable person that just the opposite was the case. We do not think that a reasonable person, under the circumstances, would have considered that he was free to disregard the deputies and simply drive away.").